Barney, J.,
delivered the opinion of the court:
The claimants in this case on May 27,1836, together constituted one tribe of Indians then residing in the then Territory of Michigan, and on said date entered into a treaty with the United States, by the terms of which said tribe ceded certain lands to the United States, and in return for which the United States agreed to certain reservations for the Indians, the payment to them and their half-breed relatives of certain sums of money, and the payment of an annuity of $30,000. It should also be stated that said treaty contained other liabilities on the part of the United States to the Indians by way of maintenance of shops, providing farmers, etc.
The provision for the annuity is provided for in article 4 of said treaty, and is as follows:
“ In consideration of the foregoing cessions the United States engages to pay to the Ottawa and Chippewa nations the following sums, namely: First, an annuity of thirty thousand dollars per annum in specie for twenty years; eighteen thousand dollars to be paid to the Indians between Grand River and the Cheboigan; three thousand six hundred dollars to the Indians on the Huron shore, between the Che-boigan and Thunder Bay rivers; and seven thousand four hundred dollars to the Chippewas north of the straits, as far as the cession extends; the remaining one thousand dollars to *245 be invested in stock by the Treasury Department, and to remain incapable of being sold without the consent of the President and Senate, which may, however, be given after the ex-. piration of twenty-one years.” (Y Stat. L., 491.)
In compliance with the terms of this treaty the United States, in addition to the payment of the $29,000 provided for, every year thereafter and up to and including the year Í855, appropriated $1,000 for the further fulfillment of said treaty obligation, and the same was invested by the Treasurer of the United States in stocks and bonds for the benefit of the claimants, and these securities were held for that purpose by the United States.
On the 31st day of July, 1855, another treaty was concluded between the United States and the claimants, making changes in the relations of the parties as to lands, annuities, etc., and article 8 of said treaty is as follows:
“ The Ottawa and Chippewa Indians hereby release and discharge the United States from all liability on account of former treaty stipulations, it being distinctly understood 'and agreed that the grants and payments hereinbefore provided for are in lieu and satisfaction of all claims, legal and equitable, on the part of said Indians jointly and severally against the United States, for land, money, or other thing guaranteed to said tribes or either of them by the stipulations of any former treaty or treaties; excepting, however, the right of fishing and encampment secured to the Chippewas of Sault Ste. Marie by the treaty of June 16,1820.” (11 Stat. L., 621.)
Thereafter, and until February 2, 1885, said stocks and bonds were carried upon the books of the Treasurer of the United States and the Department of the Interior as an Ottawa and Chippewa fund, and the same appears from year to year in the report of the Commissioner of Indian Affairs as “ Trust funds ” and “ Investments of funds in trust.”
In 1885 these securities, from accrued interest and reinvestment, had accumulated to the amount of $62,496.40, but some time in that year they were covered into the Treasury of the United States.
This action is brought by the claimants to recover the above amount and interest, under section 3659, Eevised Statutes, pursuant to an act of Congress approved March 3, 1905, conferring jurisdiction upon this court for that purpose.
*246 It is contended by the defendants that this fund was settled for and released by the claimants by the terms of article 3 of the treaty of 1855 {supra) and thereafter became the property of the United .States, while it is contended by the claimants that this fund was not embraced within the relin-quishments of that treaty; and that is the question before this court for decision.
It is not, and can not be, disputed that these nineteen annual installments of $1,000, which became due from year to 3rear under the treaty of 1836 and were appropriated for by Congress, was money belonging to the claimants, and when invested by the defendants in stocks and bonds such securities were held by the defendants in trust for them.
Thus it appears that at the time of the conclusion of the treaty of 1855 the United States had fulfilled all of its annuity obligations under the treaty of 1836; it had paid to the Indians the $29,000 yearly and had invested for their use $1,000 each year; and in so doing it had only paid them what was their due. Up to that date the treaty of 1836 had been fully executed, so that there could be no liability or claim under it except in futuro. It should be remembered, however, and that fact has an important bearing upon this case, that there were other obligations and liabilities on the part of the Government embraced in the treaty aside from these annuities. By the terms of the treaty of 1855 the Indians, in consideration thereof, released the United States from all liability on account of former treaty stipulations and from all claims, etc., guaranteed to them by the same. What were the liabilities of and claims against the United States “ guaranteed * * * by the stipulations of any former treaty?” Certainty not the $1,000 yearly installments which had then been fully paid to the Indians by way of investment of the same for their use in stocks and bonds; but only such as might grow out of that treaty in the future. In other words, the treaty of 1855, after.its conclusion, took the place of the treaty of 1836, but did not take away from the Indians anything which they had already received under the latter treaty. The Government was thereby released from the payment of any annuities in the future, and was also released *247 from its other obligations under the treaty which were to be performed in the future. ••
The obligation which the Government was under to account for the securities which it-had in its possession as trustee for the Indians did not grow out of the treaty, but was imposed upon it by the law. The treaty obligated it to make these investments for the Indians; the law imposed upon it the duty to account for them as trustee to its cestui que trust.
Evidence on behalf of the Government has been offered and received, under objection by the claimant, of what was said at a council or “ powwow ” held between the Indians and the commissioners on the part of the Government shortly before the signing of the treaty of 1855; also the report of the commissioners, who negotiated the treaty on the part of the Government, for the purpose of showing that the Indians understood that by the treaty they relinquished all claims to the securities mentioned.
It is very doubtful whether that evidence in the form offered was properly receivable for any purpose, but that question is not here decided. We do not think, however, any evidence should be received and considered in this case to aid in the construction of the treaty in the way asked for by the Government.
It is only where the meaning of the words is uncertain or ambiguous that evidence, either of prior or subsequent acts of the parties to ascertain their meaning, is permissible. When the meaning of-the language used is certain, extrinsic evidence is not admissible on the ground of aiding the construction, for in such case the only thing that could be accomplished would be to show the meaning of the writing to be other than what its terms express, but no instrument can be varied or contradicted under the guise of explanation or construction. (17 Cyc., 666, 667; Erbacher v. Seefeldt, 92 Wis., 350; Pike v. McIntosh, 167 Mass., 309; Adams v. Wilson, 12 Metc., 138.)
Where parties enter into a written compromise or settlement of claims or liabilities it is not subject to be varied or contradicted in its terms or effect by parol evidence. (Farmington v. Hayden, 119 Mass., 453, 17 Cyc., 621; Boffinger v. Tuyes, 120 U. S., 198.)
*248 As we view the two treaties we see no uncertainty or ambiguity whatever in the meaning of article 3 of the treaty of 1855 (supra). It is possible that the parties to the treaty meant as contended for by the Government, but in the language which was used they did not say so. Without quoting-authorities, it can safely be said that our courts have always been liberal toward the Indians in the construction of our treaties with them; and it would be a new departure in that respect to allow the Government to show, to their prejudice, that plain and unambiguous language had a different meaning from that used.
It is the decision of the court that the claimants have judgment against the defendants for the sum of $62,496.40, and interest thereon from the 9th day of March, 1885, at the rate of 5 per cent per annum.