**MANCHESTER BAND OF POMO IN-DIANS, INC., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

**No. 50276–CBR.**

United States District Court, N. D. California.

June 26, 1973.

Bruce R. Greene, William P. Lamb, California Indian Legal Services, Berkeley, Cal., for plaintiffs.

James L. Browning, Jr., David E. Golay, U. S. Atty., San Francisco, Cal., for defendants.

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT INTRODUCTION

RENFREW, District Judge.

The Manchester Band of Pomo Indians ("the Band") brought this action on November 8, 1968, against the United States of America and certain officers of the Interior and Treasury Depart-

ments ("the Government") charging that they had failed to manage properly certain funds of the Band.

After unsuccessful efforts to convene a three-judge court on the grounds that certain federal statutes were unconstitutional on their face because they discriminated against Indians, the Band then sought to obtain discovery. However, for reasons not explained to the satisfaction of the Court, the Government failed to comply with these discovery efforts. This failure is amply demonstrated by the following chronology.

The Band submitted its first set of interrogatories in October, 1970. Defendants objected to the interrogatories on November 10, 1970. At that time representations were made by counsel for the Government to the effect that answers to the interrogatories were being prepared. In May, 1971, the case was called for a status conference pursuant to Rule 119 of the Local Rules of Practice of this Court. Shortly thereafter, the Band filed a motion to compel answers, which was heard before The Honorable Robert F. Peckham. On August 20, 1971, Judge Peckham issued an order granting in large part the Band's motion, requiring defendants to answer the interrogatories in dispute, from available information, to the extent that they had not already been answered prior to that date. In spite of this order compelling answers, the defendants inexplicably failed to respond.

This case was reassigned to the undersigned in early 1972. Shortly after the reassignment, a status conference was held in April, 1972 and the Government was given an additional ninety days to comply with the order of the Court compelling answers. Another status conference was then held in July, 1972 (after the expiration of the additional 90-day period), at which time it was learned that the Government had still not submitted answers. Finally, on August 11, 1972, this Court issued an Order to Show Cause why defendants should not be found in contempt of court for failure to respond to discovery. De-

fendants were unable to offer any explanation for their delay, and since more than two years had elapsed since the interrogatories were propounded, this Court issued a sanction order on January 18, 1973 (a copy of which is attached hereto as Exhibit A). That order found certain facts to be true, for the purposes of this litigation, and further, barred the introduction of certain evidence by defendants.

On February 5, 1973, the Band filed a motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. In its motion the Band argued that it was entitled, as a matter of law, to a judgment that defendants were liable to the Band for failure to manage properly the funds held in trust for the Band in a manner consistent with the defendants' obligation as fiduciary and trustee for the Band. In addition, the Band moved for a declaration setting forth the statutory duties of defendants, principally of the defendant Secretary of the Interior, as to their basic obligations in the management of the Band's money. There are no material facts in controversy with respect to the Band's motion and the Court finds that the motion has merit and should be granted as hereinbelow set forth.

## I. UNCONTROVERTED FACTS.

The Manchester Band is one of several different bands of Pomo Indians in California. The Band occupies a small rancheria of approximately 360 acres, near Manchester, California, known as the Manchester-Point Arena Rancheria. In 1938 the Band became organized under the Indian Reorganization Act, 25 U.S.C. § 479 et seq., and in that same year borrowed $5,000 from the Bureau of Indian Affairs ("the BIA") to be used to initiate a dairy enterprise on the Rancheria. The loan was fully repaid by February 5, 1943 (Exhibit A, p. 2, attached to Plaintiff's Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment, hereinafter referred to as "Plaintiff's

Opening Memo"). The dairy was operated until approximately 1956. The last record of sale of butterfat was April 11, 1956, and in August, 1957, the dairy herd was sold (Exhibit C, p. 2, attached to Plaintiff's Opening Memo). Prior to 1963 the only source of income for the Band had been the dairy enterprise. The revenues generated from the dairy business were deposited in an Indian money account, which was maintained in the Sacramento Area Office of the BIA. According to BIA records, the Band had unobligated balances in their Indian money account ranging from a high of just under $10,000 in 1946 to a low of just under $100 in 1956. However, during that entire 10-year period only two payments of interest were made: $15.31 in June and $11.00 in July, 1947 (Exhibit C, p. 23, attached to Plaintiff's Opening Memo).

Beginning in April, 1963, the Band began leasing certain portions of their trust land. Generally, the BIA deposited money from the leases in the U. S. Treasury, and the deposits, to the extent they exceeded $500, earned 4 per cent simple interest per annum. However, on two occasions, lease payments were not timely credited to the Band's account. First, a $500 payment was deposited ten months late, with no payment of interest for the 10-month period.[1] Second, a lease payment for $850 was not deposited to the credit of the Band for more than 2½ years due to a bookkeeping mistake. Upon discovery, the Band received interest at 4 per cent for the 2½ year period plus the principal credited to their account.

Beginning in 1966, some but not all of the interest earned upon deposits in the U. S. Treasury was withdrawn and deposited in commercial banks at rates of interest ranging from 5 to 5.75 per cent per annum.

In summary, defendants' management of the Band's money since 1938 has been

deficient. During the entire time the dairy enterprise was operative, a period of some eighteen years, only two payments of interest were made to the Band, totalling slightly more than $26. After 1966, lease payments were deposited in the U. S. Treasury, though not always on a timely basis, and earned 4 per cent simple interest. Some, but not all, of the interest generated from the Treasury deposits were deposited in commercial banks at prevailing rates of interest, all of which were higher than 4 per cent simple interest.

## II. JURISDICTION OF THE COURT

■ The Government has raised a threshold question whether this Court has jurisdiction. The Court finds the contention that it lacks jurisdiction to be totally without merit and has heretofore ruled that it has jurisdiction over the United States with respect to the Band's claim for money damages by virtue of 28 U.S.C. § 1346(a)(2). The Government's contention that 28 U.S.C. § 1505 gives exclusive jurisdiction to the Court of Claims is contrary to the legislative history of that section and flies in the face of the clear language of 28 U. S.C. § 1346(a)(2). House Report No. 1466 (79th Cong., 2d Sess.) in U.S.Code Congressional Service, 79th Cong., 2d Sess., 1946, at 1347, 1348.

That jurisdiction lies in this Court is also clearly established by virtue of other federal statutes including 25 U.S.C. §§ 161a and 162a which establish the financial-managerial duties in question; 5 U.S.C. §§ 701–706 which provide for judicial review of the manner in which those obligations are carried out; and 28 U.S.C. § 1361 which provides for jurisdiction over actions to compel the responsible officers of the United States to perform those duties in the event they have not done so.

In addition, it is clearly provided by 28 U.S.C. § 1362 that the district courts

---

1. The answers to interrogatories filed by Mr. William D. Oliver on November 24, 1970, indicate that the only excuse offered for the delay in depositing the funds in the Treasury was a lack of BIA staff necessary to make the transactions more timely.

shall have original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.[2]

Accordingly, this Court finds that it clearly does have jurisdiction over this matter.

### III. DEFENDANTS' FIDUCIARY OBLIGATIONS

■ The basic question presented by the Band's motion is whether the investment decisions made by defendants complied with the statutory and judicially created trust obligations owed to the Band. Initially, this requires a determination of precisely what obligations defendants had to the Band. It is unquestioned that the United States has a solemn trust obligation to the Indian people. In Seminole Nation v. United States, 316 U.S. 286, 296–297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, 1777 (1942), the Supreme Court discussed the scope of the fiduciary obligation of the United States in its management of Indian trust funds as follows:

"Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians should therefore be judged by the most exacting fiduciary standards."

Accordingly, in Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F.Supp. 252 (D.D.C.1972), Judge Gesell held, in reviewing the action of the Department of the Interior with respect to a diversion of the waters of the Truckee and Carson Rivers, that the Department had failed to maintain the exacting standards required of a trustee. In finding that the Interior Department had not fulfilled its solemn trust obligation owed to Indians because of an intra-departmental conflict of interest the court stated: "Undertakings with the Indians are to be liberally construed to the benefit of the Indians * * *." 354 F.Supp. 252 at 256. See also Rockbridge v. Lincoln, 449 F.2d 567 (9th Cir. 1971); and Navajo Tribe of Indians v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966).

Congress has also been vigilant in setting forth the standards by which Government-managed Indian trust funds must be invested. Prior to 1930, certain Indian treaties and certain statutes dealing with Indians contained stipulated rates of interest on Indian funds. See, e. g., 25 U.S.C. § 159. However, the Government was holding substantial Indian funds without provision for the payment of interest. It was felt that while the Government was not legally obligated to so provide, in the absence of a requirement either in a treaty or statute, nevertheless, because of its relationship with Indians, a minimum rate of interest should be provided on all Indian funds held in trust by the United States. See Senate Report No. 1396, 70th Congress, 2d Session (1928). To carry out that obligation, Congress enacted 25 U.S.C. § 161a, which provides:

"All funds with account balances exceeding $500 held in trust by the United States and carried in principal accounts on the books of the Treasury Department to the credit of Indian tribes, upon which interest is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum."

■ This payment of simple interest of 4 per cent was authorized on deposits of Indian trust funds in the hands of

---

2. That the scope of the fiduciary duty of the United States in administering trust property is a question of federal law was thought to be unquestionable by Justice Marshall, writing for the majority in United States v. Mason, 412 U.S. 391 at 397, 93 S.Ct. 2202 at 2207, n. 9, 37 L.Ed.2d 22 (1973).

the Treasury as to which, in the absence of other legislation, no interest could be paid. By that action, Congress did not intend that *all* Indian trust funds should receive only a 4 per cent rate of return, since Congress did not and has not required that all Indian money be deposited in the Treasury. See 31 U.S.C. § 725s(a)(20). Instead, Congress directed that such Indian money as *is* deposited with the Treasury shall earn 4 per cent interest, unless a different rate is specified in another statute. In other words, § 161a did not set a ceiling of 4 per cent interest, but rather a floor, or guaranteed return, of at least 4 per cent when there were no other investments which paid a higher rate of return which a reasonably prudent trustee would be authorized to make.

▋ Congress has seen fit to authorize other investments for Government-managed Indian trust funds. For example, by virtue of § 162a of Title 25 the Secretary of the Interior may withdraw Indian moneys from the Treasury and invest them in: (1) bank deposits which are insured by the Federal Deposit Insurance Corporation; (2) public debt obligations of the United States; and (3) any bonds, notes, or other obligations which are unconditionally guaranteed as to both principal and interest by the United States.

In addition, Congress has provided that *all* Government managed trust funds may be invested in: (1) bonds and other obligations issued by the Tennessee Valley Authority (16 U.S.C. § 831n-4(d)); (2) obligations issued by the Federal Home Loan Banks (12 U.S.C. § 1435); (3) bonds, notes or debentures issued by the Commodity Credit Corporation (15 U.S.C. § 713a-4); and (4) obligations issued by the Government National Mortgage Association and the Federal National Mortgage Association (12 U.S.C. § 1723c).

Items 1, 2 and 4 are not obligations expressly guaranteed as to principal and interest by the United States, and for this reason on their face do not appear to be authorized investments of Indian funds as designated by 25 U.S.C. § 162a. The Band argues, however, that since these statutes apply to a class (i. e., all Government-managed trust funds), which includes funds managed for Indians, the statutes referred to above modify 25 U.S.C. § 162a.

In a memorandum to the Commissioner of the Bureau of Indian Affairs from the Associate Solicitor for Indian Affairs, Department of Interior (attached as Exhibit F to Plaintiff's Opening Memo), dated May 3, 1968, this very point was at issue. At page 1 of that memorandum, the Associate Solicitor stated:

"In particular, the memoranda inquire whether various securities can be considered for the investment of tribal funds under the provisions of the 1938 Act [25 U.S.C. § 162a] which permits their investment in 'public-debt obligations of the United States' and 'bonds, notes or other obligations which are unconditionally guaranteed as to both principal and interest by the United States.'"

The Associate Solicitor, agreeing with the plaintiff's position that § 162a was modified by other statutes which apply to all Government-managed trust funds, stated:

"Congress, however, has provided that all obligations, participations, or other instruments issued by FNMA [the Federal National Mortgage Association] are lawful investments for all trust funds under the authority or control of the United States. 12 U.S. C. § 1723c (1964). This provision, in our opinion, constitutes a grant of additional authority to permit the investment of tribal trust funds both in FNMA participation certificates guaranteed by the United States and other FNMA obligations which are not so guaranteed." (Memorandum, p. 2.)

Title 12, U.S.C. § 1730b provides that insured savings accounts in savings and loan associations insured by the Federal Savings and Loan Insurance Corporation

are "lawful investments * * * for all * * * fiduciary and trust funds under the authority or control of the United States or any officer or officers thereof, and for the funds of all corporations organized under the laws of the United States * * *, regardless of any limitation of law upon the investment of any such funds * * *." Therefore, under the theory articulated in the Associate Solicitor's Memorandum referred to above, although not authorized by 25 U.S.C. § 162a, the Band claims that insured savings and loan savings accounts are also within the range of permissible investments for the Band's funds.

This Court finds that the position of the Band and that of the Associate Solicitor of Indian Affairs referred to above to be sound and in accord with the intent of Congress. Therefore, it is the opinion of this Court that the present statutory scheme entitles the Band to a minimum return of 4 per cent on its trust moneys and authorizes investment in the range of investment alternatives outlined above.

Having ascertained the scope of the fiduciary obligations of the Secretary of the Interior, we then turn to the manner by which he may discharge those obligations in selecting investments from among the authorized alternatives.

It is well established that conduct of the Government as a trustee is measured by the same standards applicable to private trustees. United States v. Mason, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973). Accordingly, the Government as trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary. Restatement (Second) of Trusts, § 170(1) (1959) ("Restatement 2d"). While it is true that under the terms of the trust, the trustee may be permitted to lend himself money held by him in trust, the trustee violates his duty to the beneficiary if he acts in bad faith, no matter how broad the provisions of the trust may be. Restatement 2d, § 170, comment at 372.

Further, the trustee is accountable for any profit made by him arising out of the administration of the trust, regardless of whether he entered into the transaction with the intent of making a profit for himself or not, and regardless of the fact that he commits no breach of the trust in so doing. Restatement 2d, § 203.

Finally, it is well recognized that the trustee is under a duty to the beneficiary to use reasonable care and skill to make the trust property productive. In the case of trust moneys, it is thus normally the duty of the trustee to invest it so that it will produce income. Restatement 2d, § 181. While the normal standard of care and skill required of a trustee is that of a man of ordinary prudence in dealing with his own property, if the particular trustee has a greater degree of skill than that of a man of ordinary prudence, he will be held liable for any loss resulting from the failure to use such skill as he has. Restatement 2d, § 174, comment at 379.

Those principles have been applied in several cases involving choices between higher and lower paying investments. For example, in In re Soss' Estate, 71 N.Y.S.2d 23, 28 (Sup.Ct., N.Y. County 1947), private trustees were held liable because they invested the trust corpus in government bonds paying two per cent interest rather than those paying 2½ per cent. There, the court held: "Since the government bonds in each category were absolutely secured as to principal the purchase of the bonds yielding the lower rate was a breach of fiduciary duty."

The scope of this obligation was set forth in detail in Estate of Whitney, 78 Cal.App. 638, 645–646, 248 P. 754, 757 (1926). The court there said:

"If, then, in carrying out the manifest intention of the testator, delay in distribution occurs for any reason, and sums accumulate, that simple business

prudence would dictate should be invested, and such sums are not invested or placed at interest, such omission should and will subject trustees to the payment of the interest they ought to have received. If they become short of this duty, they will be held to a strict personal accountability for any losses which may result from such omissions. * * *

* * * [T]he mere fact that the bank in which the trust funds are deposited, and in which the trustees are officers, pays no interest on sums awaiting distribution, will not relieve the trustees from placing the funds in some other reliable bank that does pay interest."

■■■ Nor does the fact the trustees are not compensated by the trust establish a lower standard of duty. In Lynch v. John M. Redfield Foundation, 9 Cal. App.3d 293, 88 Cal.Rptr. 86 (1970), a charitable trust was managed by unpaid trustees. In that case the court found a breach of fiduciary duties by trustees who allowed trust income to accumulate for five years in a non-interest bearing checking account. Among the defenses rejected by the court were lack of compensation to the trustees, an increase in the trust corpus, and the trustees' good faith. The court ruled that the trustees were obliged to manage the trust's assets with the degree of care and diligence which a prudent man would exercise in the management of his own affairs.

The case of The Menominee Tribe of Indians v. United States, 101 Ct.Cl. 10 (1944), applied these standards governing a private fiduciary to Government-managed trusts. There, the United States had created several trust funds in the Treasury for the benefit of the Menominees. Five of these trusts paid no interest, two paid 4 per cent, and two others paid 5 per cent. Under the treaties and statutes creating the trusts, the Secretary of the Interior was authorized to expend the funds on behalf of the Indians and in many cases was authorized to make the same type of expenditures (e. g., health, education) from a number of funds. For reasons best known to himself, the Secretary failed to exhaust the non-interest bearing funds before making expenditures from the interest bearing accounts, and failed to exhaust the 4 per cent trusts before drawing upon the 5 per cent funds. Under these circumstances the court held the Government liable to Indian beneficiaries:

"The various acts of Congress authorizing expenditures from funds of the tribe did not repudiate the trust obligation. Under those acts the Secretary of the Interior had the power to comply with the trust obligation, i. e., to spend the non-interest-bearing funds first, to whatever extent they were available and sufficient. It would be fair to suppose that Congress expected him to do that, and thus fulfill the Government's duty as a quasi trustee. But whether Congress expected that, or was not conscious of the problem, the Secretary, acting for the Government was under a duty to act in harmony with the Government's position as a fiduciary, and he was not prevented from doing so by the statutes under which he acted.

We conclude, therefore, that to whatever extent the Secretary of the Interior could have, in the course of prudent management of the affairs of the Indians, and without impairing funds which he reasonably thought it was necessary to keep supplied for the purpose of meeting authorized expenditures, used the non-interest-bearing funds or those bearing the lower rate of interest, and instead used funds bearing interest, or a higher rate of interest, the government is under a duty to pay to the plaintiffs the interest thereby lost by them." 101 Ct.Cl. 10, at 21.

Similarly, in Menominee Tribe of Indians v. United States, 59 F.Supp. 137, 102 Ct.Cl. 555 (1945), the court held that the Government breached its fidu-

ciary role when it obtained money for log-cutting from a 5 per cent Treasury account, as authorized by statute, but then repaid that money (out of log sale proceeds) into a 4 per cent fund. The court said there:

> "So much, a[t] least, is required by the Acts of 1906 and 1908; but defendant stood in a fiduciary relationship to plaintiff, and as a fiduciary it was under the obligation to use funds in its hands in the way most beneficial to plaintiff. It was prohibited from using them for its own benefit. This required it to make restitution of the amounts withdrawn from the 5 percent fund, instead of borrowing these amounts from plaintiff at a lesser rate of interest." 59 F.Supp. 137, at 141.

▇▇▇ It is clear then that in the present case the Government is not free to choose any investment merely because that investment was authorized by statute. Under the present statutes there will always be several investment alternatives available to the trustee at any time. Thus, he could choose to deposit moneys in the Treasury and earn 4 per cent per annum where no higher return was available, but the failure to reinvest the interest generated on the funds would constitute a breach of duty, in the absence of any special circumstances which would demonstrate that such failure was in the best interest of the beneficiaries and in accord with the care and diligence which a man of ordinary providence would exercise in dealing with his own property. On the other hand, where the income from short-term Government bonds was higher, the trust obligations of the Secretary would not be satisfied by depositing the money in the Treasury at 4 per cent, but rather by investment in those short-term bonds. Similarly, if other Government securities authorized for investment pay higher rates of return and are equally safe and liquid, then the trustee is obligated to invest in those government bonds yielding the highest rate of return. The Secretary of the Interior is under a duty to act

pursuant to the Government's fiduciary obligations, and he is not prevented from doing so by the statutes which authorize various investments for Indian trust funds.

▇▇▇ Based upon the foregoing, it is clear that in several instances defendants here have breached their solemn fiduciary duty owed to the Band to manage properly their trust funds, and are therefore liable. First, the facts found to be true on January 18, 1973, for purposes of this litigation, demonstrate that the "defendants have failed to show that at any time between 1938 and the present, they acted as reasonably prudent trustees in the management of the funds * * * held in trust for the * * * Band * * *." (Finding 1, Exhibit A.) The defendants "derived a financial advantage from the investment policies actually pursued" because they "repeatedly borrowed the Band's funds at a lower rate of interest than defendants would have had to pay to borrow money in the open market." (Findings 2 and 3, Exhibit A.)

Second, between 1938 and approximately 1959 the BIA held funds generated from the Band's dairy enterprise, but, with the exception of two payments of interest totalling slightly more than $26, made no investments whatsoever with these funds. BIA's own ledger sheets (Exhibit C to Plaintiff's Opening Memo) show that the average unobligated balances of the Band were as high as $7,500 in some years. From 1957 on, after the sale of the dairy herd and the termination of the dairy enterprise, the Band had an unobligated balance in excess of $3,500. Yet for most years until approximately 1965, this money was allowed to lay fallow. This type of mismanagement cannot be sanctioned by a court of law.

Third, while the fiduciary deposited the Band's money in the Treasury from approximately 1966 to date, documentary material produced in response to discovery demonstrates that at least for those years in question, numerous series of short-term government bonds were pay-

ing interest rates higher than 4 per cent. Accordingly, the Band has been damaged by the difference between the income actually received and that amount they would have received had the trustee acted as required by traditional fiduciary standards.[3]

The exact computation of damages to determine the dollar amount of liability arising from this mismanagement of trust funds is not possible at this time. It is clear that there has been a breach of duty and that liability flows from this breach. However, in order to determine precisely the amount of that liability, evidence will have to be offered from which a determination can be made as to which investments would have been made by a reasonably prudent trustee in the course of discharging his fiduciary obligations.

## IV. DEFENDANTS' OBLIGATION TO ACCOUNT TO THE BAND

The Band also seeks an accounting from defendants for the handling of the Band's funds between 1938 and 1946 and a declaration of defendants' obligation to account regularly to the Band in the future.

■ While defendants concede that as to the years 1938 to 1946 no accounting has been rendered, they argue that the duty to supply an accounting ceased upon the Band's filing a lawsuit, and that in any event the Band's counsel reviewed the Band's ledgers in the BIA offices in Sacramento. The authorities are contrary. In Sakezzie v. Utah State Indian Affairs Commission, 215 F.Supp. 12, 19 (D.Utah 1963), the court held the fiduciary was obligated to provide its wards with an accounting, and that "it is no answer to say that the information could be ferreted out from their records by the plaintiffs [Indians]." See also The Ottawa and Chippewa Indians v. United States, 42 Ct.Cl. 240, 247 (1907).

■ The Court has been advised that BIA has inaugurated monthly accountings to the Indian tribes. These accountings give dollar amounts for deposits in the U. S. Treasury and for all other investments as a group, but they do not tell what rate of interest is paid on the Treasury deposits nor do the accountings give any information as to the nature of the other investments. The Band is entitled to an accounting that tells in clear terms the specific investments made with the Band's money, the rate of interest, and the amount earned on each investment.

■ There was a suggestion that more detailed information would be supplied by BIA in annual reports. However, defendants' duty to render satisfactory accountings to the Band is a continuing duty. Restatement (Second) of Trusts, § 172. Before approving such a practice, the Court needs to hear from the parties further as to whether an annual report would give the Band adequate opportunity to make its views known to defendants. The Court would also like to have the benefit of the position of the parties with respect to how often detailed accountings should be provided and what problems are presented if such a requirement is imposed by the Court.

---

3. In this connection the Secretary must consider whether funds from one Indian trust fund should be combined with funds from another Indian trust to purchase a single instrument of indebtedness, and thereby extending to small trusts the benefits of larger returns from larger and longer term investments. The Restatement of Trusts, Second, recognizes this practice of commingling by stating that "the fact that in making investments trust funds of one trust are combined with funds of other trusts administered by the trustee does not make the investment improper, provided that it is in other respects proper.' (Restatement 2d, § 227, comment j.) Finding 12 of this Court's January 18, 1973, sanction order makes clear that defendants have commingled some Indian trust funds in the past. Commingling then is one other factor the Secretary must consider in discharging his trust obligations consistent with the standards set forth in this opinion.

## V. STATUTE OF LIMITATIONS

The Government also contends that the Band's claim for damages, to the extent it is allowed, is barred by the statute of limitations as to damages accruing prior to November 8, 1962, six years before the Band filed its original complaint.[4] The Court must reject that contention for two reasons. First, where, as here, there is a fiduciary relationship between the parties, the universal rule is that "a statute of limitation does not begin to run where there is a fiduciary relationship between the parties until the relationship is repudiated." Kasey v. Molybdenum Corporation of America, 336 F.2d 560, 569 (9 Cir. 1964). See generally 31 Cal.Jur.2d, Limitation of Actions, §§ 22, 23, 138–141. See also Oldland v. Gray, 179 F.2d 408, 415–416 (10 Cir. 1950), cert. denied, 339 U.S. 948, 70 S.Ct. 803, 94 L. Ed. 1362; Sadler v. Sadler, 73 F.Supp. 583, 586 (D.Nev.1947), 167 F.2d 1 (9 Cir. 1948); Stoll v. Selander, 81 Cal. App.2d 286, 183 P.2d 935, 939 (1947); ("the statute of limitations never runs in favor of a trustee as against a beneficiary while the latter is in possession of the property") Berniker v. Berniker, 30 Cal.2d 439, 182 P.2d 557, 563 (1947). Accord: United States v. Taylor, 104 U.S. 216, 221–222, 26 L.Ed. 721 (1881). Thus, the statute does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship terminated.

This general rule has been applied in cases involving Indian beneficiaries suing the Government for tax refunds arising out of mismanagement of trust funds. Dodge v. United States, 362 F. 2d 810, 176 Ct.Cl. 476 (1866); Daney v. United States, 247 F.Supp. 533 (D.Kan. 1965), affirmed, 370 F.2d 791 (10 Cir. 1966); Nash v. Wiseman, 227 F.Supp. 552 (W.D.Okla.1963). While neither the parties nor the Court have been able to find a case directly on point, there appears to be no reason for a different rule where the trustee failed to credit the trust with trust income, as here, than in the case where the trustee improperly paid out trust income as in the *Nash, Daney* and *Dodge* cases. As stated in the *Dodge* case, the reason for such a rule "concentrates on the necessity of dealing fairly with a group of people still placed under a disability of dependency and to which a greater obligation is owed than a narrowly legalistic view of what constitutes a technical 'duty.' " 362 F.2d 810, at 813.

Second, the Court finds the statute does not run where the Band did not know or reasonably could not have known of the factual basis of its claim more than six years before suit was filed. In Spevack v. United States, 390 F.2d 977, 182 Ct.Cl. 1884 (1968), a case arising under the Tucker Act, the Government had made secret use of plaintiff's patented process. Although plaintiff's claim arose when the process was first used by the Government, the court held that the six-year statute of limitations did not begin to run during the period that such use was secret and therefore concealed from plaintiff.

In this case, the facts giving rise to defendants' breach of their duty were only revealed through the very incomplete discovery obtained. Since it was not a practice by defendants to pay out income from the trust accounts to the Band regularly, or to give periodic accountings, the absence of payments or information to the Band over the years did not put it on notice that the funds were being improperly managed. The Band has relied upon the good faith of their fiduciaries, the agents of the United States. Under these circumstances, the statute of limitations does not bar any portion of the Band's discovery. See generally, Chisholm v. House, 183 F.2d 698 (10th Cir. 1950); Adams v. Albany, 80 F.Supp.

4. The applicable statute of limitations is six years. 28 U.S.C. § 2401(a). Erceg v. United States, 179 F.2d 510, 511, 12 Alaska 569 (9th Cir. 1950); Neher v. United States, 265 F. Supp. 210, 216 (D.Minn.1967).

876, 882–884 (S.D.Cal.1948), and cases cited, particularly at n. 21; Warrington v. Charles Pfizer and Co., 274 Cal.App. 2d 564, 80 Cal.Rptr. 130, 132 (1969).

Accordingly, the Court is persuaded that there is no bar by the statute of limitations with respect to the claim of the Band.

## CONCLUSION

For the reasons and upon the authorities set forth in this order, the Band's motion for partial summary judgment is hereby granted. The parties should prepare to offer evidence on the remaining issues in the case in accordance with this order and at a date mutually convenient to the parties and to the Court.

It is hereby ordered that plaintiff's motion for partial summary judgment is granted.

## EXHIBIT A.

## ORDER

Plaintiff in this action, the Manchester Pomo Band of Indians, has brought suit against the United States and named representatives of the federal government alleging that these defendants have mismanaged the plaintiff's trust fund moneys. More than two years ago, on October 9, 1970, plaintiff propounded its first set of interrogatories to the federal defendants. Defendants responded on November 10, 1970, with their objections. Counsel for plaintiff advised the Court that based on representations of counsel for the government to the effect that answers were being prepared, plaintiff refrained from bringing on for hearing a motion to compel answers. That remained plaintiff's position through May, 1971, when the case was called for a status conference, pursuant to Rule 119 of the Local Rules of Practice of this Court. Shortly thereafter, with defendants still having failed to submit answers, plaintiff filed a motion to compel answers, which was heard before the Honorable Robert F. Peckham. On August 20, 1971, Judge Peckham issued an order granting in large part plaintiff's requested relief. Even after Judge Peckham's order compelling answers, the defendants still failed to respond to the interrogatories in question.

In early 1972, the case was reassigned to the undersigned. Shortly after the reassignment, a status conference was held and the government was given 90 additional days to respond to the interrogatories. In July 1972, after the elapse of the 90 day period, the government had still not responded. Finally, on August 11, 1972, this Court issued an Order to Show Cause, on plaintiff's application, as to why the federal defendants should not be held in contempt of prior Court orders requiring answers to interrogatories. Following the issuance of the show cause order, counsel for plaintiff and defendants appeared before the Court on four different occasions in an effort to arrive at an appropriate sanction against the defendants.[1]

More than two years have transpired since the plaintiff propounded its first set of interrogatories. The defendants have failed to offer any explanation for their inexcusable delay or their failure to comply with the Court's order to answer the interrogatories; therefore, the Court believes this to be an appropriate situation to make adverse findings of fact and bar the introduction of evidence as sanctions against the flagrant disrespect by federal defendants of previous Court orders.

Pursuant to Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, the Court finds the following facts to be true:

1. Defendants have failed to show that at any time between 1938 and the present, they acted as reasonably prudent trustees in the man-

---

1. While the defendants' conduct has clearly been inexcusable, it should be noted that counsel for the government has been cooperative and is not responsible for the goverment's failure to comply with the outstanding orders of this Court.

agement of the funds which they held in trust for the Manchester Band of Pomo Indians.

2. The United States Government derived a financial advantage from the investment policies actually pursued with respect to the Band's funds.

3. Defendants repeatedly borrowed the Band's funds at a lower rate of interest than Defendants would have had to pay to borrow money in the open market.

4. Defendants have failed to offer any evidence that they attempted to manage in any way the Band's funds prior to 1956.

5. Defendants have failed to show any justification for not investing the Band's funds in Treasury accounts, United States bonds and notes, commercial bank accounts insured by the Federal Deposit Insurance Corporation, savings and loan association accounts insured by the Federal Savings and Loan Insurance Corporation, stocks of the United States bearing at least 5% compound interest, obligations of Federal Intermediate Credit Banks, obligations of Federal Home Loan Banks, obligations or participations or other instruments issued by the Federal National Mortgage Association, Tennessee Valley Authority bonds, and obligations of the Commodity Credit Corporation when such investments would have provided a greater return on the Band's funds than was obtained by the investments (or non-investments) Defendants actually made.

6. Findings 1–5 do not establish whether the statutory limits, if any, on the investment of government managed Indian trust funds are or are not constitutional.

7. Obligations of the Federal Housing Administration were at all times between 1938 and 1972 paying interest at the rate of 6⅞%.

8. Between 1938 and 1972 the Commodity Credit Corporation was constantly selling obligations in denominations of $100, with terms of 30 days, and with interest rates at least as high as the highest rate of interest on obligations issued at the same time (without regard to term or denomination) by the United States, the Federal Intermediate Credit Banks, the Federal-Home Loan Banks, the Federal Land Banks, or the Federal National Mortgage Association.

9. Between 1938 and 1955 the Federal National Mortgage Association was constantly selling obligations in denominations of $100, with terms of 30 days, and with interest rates at least as high as the highest rate of interest on obligations issued at the same time (without regard to term or denomination) by the United States, the Federal Intermediate Credit Banks, the Federal Home Loan Banks, or the Federal Land Banks.

10. Between 1958 and 1972 both the Federal National Mortgage Association and the Federal Home Loan Banks issued all their obligations in denominations of $100.

11. Between 1968 and 1972 the Government National Mortgage Association was constantly selling obligations in denominations of $100, with terms of 30 days, and with interest rates at least as high as the highest rate of interest on obligations issued by the United States, the Federal Intermediate Credit Banks, the Federal Home Loan Banks, or the Federal Land Banks.

12. Defendants have made investments of Indian trust funds by purchasing a single instrument of indebtedness with the funds of more than one Indian, Indian tribe, or other Indian organization.

13. The defendants do not know now and have not known since at least 1938 the total or per beneficiary assets or incomes of Government managed Indian trust funds, the total or per beneficiary assets or incomes of other Government managed trust funds, the trust and non-trust assets or incomes of beneficiaries of Government managed Indian trust funds, or the trust and non-trust assets or incomes of beneficiaries of other Government managed trust funds.

14. At numerous times since 1938 defendants have invested non-Indian trust funds in obligations of the Federal National Mortgage Association, Tennessee Valley Authority, Federal Intermediate Credit Banks, Federal Land Banks, Federal Home Loan Banks, Commodity Credit Corporation, Banks for Cooperatives, and Government National Mortgage Association.

Pursuant to Rule 37(b)(2)(B) of the Federal Rules of Civil Procedure the Court further orders:

1. The defendants are barred from introducing, at any time during the pendency of this lawsuit, any oral or documentary evidence to justify or in any way explain the rationale for their investments, their failures to invest and their investment decisions with respect to the Band's money; nor may the defendants rely, directly or indirectly, on any evidence submitted to date in partial answer to interrogatory 19.

2. The defendants are barred from introducing, at any time during the pendency of this lawsuit, any oral or documentary evidence which would be inconsistent with findings 13 and 14, above; nor may the defendants rely, directly or indirectly, on any evidence submitted to date in partial answer to interrogatory 25.