502 F.2d 90
 6 ERC 1952, 4 Envtl. L. Rep. 20,723
 The PEOPLE OF SAIPAN, By and Through Herman Q. GUERRERO, et
al., Plaintiffs and Appellants,
v.
UNITED STATES DEPARTMENT OF INTERIOR et al., Governmental
Defendants andAppellees, and Continental Airlines,
Inc., a Nevada corporation,
CorporateDefendant and Appellee.
 No. 73-1769.
 United States Court of Appeals, Ninth Circuit.
 July 16, 1974.
 
 Samuel Withers, III, Edward C. King (argued), Daniel H. MacMeekin, Micronesian Legal Services Corp., Saipan, Mariana Islands, for plaintiffs and appellants; Richard A. Falk, Princeton University, Princeton, N.J., of counsel on the brief.
 Charles W. Kenady (argued) of Cooper, White & Cooper, San Francisco, Cal., for defendant and appellee Continental Air Lines.
 Carlos Salii, Asst. Atty. Gen. (argued), Saipan, Mariana Islands,
 Jacques B. Gelin, Atty., Dept. of Justice, Washington D.C., for defendants and appellees.
 Before TRASK and GOODWIN, Circuit Judges, and EAST,* District judge.
 ALFRED T. GOODWIN, Circuit Judge:
 
 
 1
 Plaintiffs, citizens of the Trust Territory of the Pacific Islands (known also as Micronesia), sued in the district court to challenge the execution by the High Commissioner of the Trust Territory of a lease permitting Continental Airlines to construct and operate a hotel on public land adjacent to Micro Beach, Saipan. Plaintiffs appeal a judgment of dismissal.
 
 
 2
 The district court held that the Trust Territory government is not a federal agency subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. 701-706, or the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq., and that the Trusteeship Agreement does not vest plaintiffs with individual legal rights which they can assert in a federal court. The court's opinion is published at 356 F.Supp. 645 (D.Haw.1973). We affirm the judgment, but, for the reasons set out below, we do so without prejudice to the right of the plaintiffs to refile in the district court should the High Court of the Trust Territory deny that it has jurisdiction to review the legality of the actions of the High Commissioner.
 
 
 3
 The facts are set out in detail in the district court opinion. In brief, Continental applied in 1970 to the Trust Territory government for permission to build a hotel on public land adjacent to Micro Beach, Saipan, an important historical, cultural, and recreational site for the people of the islands. Pursuant to the requirements of the Trust Territory Code, 67 T.T.C. 53, Continental's application was submitted to the Mariana Islands District Land Advisory Board for its consideration. In spite of the Board's unanimous recommendation that the area be reserved for public park purposes, the District Administrator of the Marianas District recommended approval of a lease. The High Commissioner himself executed the lease on behalf of the Trust Territory government. An officer appointed by the President of the United States with the advice and consent of the Senate (48 U.S.C. 1681a), the High Commissioner is the highest official in the executive branch of the Trust Territory government.
 
 
 4
 Following its execution in 1972, the lease was opposed by virtually every official body elected by the people of Saipan. Indeed, the record in this case shows that the High Commissioner's decision was officially supported only by the United States Department of the Interior, the Trust Territory Attorney General (a United States citizen), and the District Administrator of the Marianas District (appointed by the High Commissioner, serving directly under him, and subject to removal by him).
 
 
 5
 Later in 1972, an action against some of the parties here was commenced before the High Court of the Trust Territory to enjoin construction of the hotel. The High Court, while denying defendants' motions to dismiss on certain nonfederal causes of action, held that NEPA did not apply to actions of the Trust Territory government, as plaintiffs had contended.[1] Soon afterward, the plaintiffs filed this action in the United States District Court for the District of Hawaii, and the High Court thereupon stayed proceedings before it pending the outcome of this action.
 
 I. JUDICIAL REVIEW UNDER THE APA OR NEPA
 
 6
 The district court, relying upon its earlier decision in People of Enewetak v. Laird, 353 F.Supp. 811 (D.Haw.1973), again held that NEPA applies to federal agencies operating in the Trust Territory. It also held that approval of the lease agreement was 'major' action, within the meaning of NEPA. However, although the district court rejected the defendants' contention that the Trust Territory government is a foreign government immune to suits in United States courts, it accepted the defendants' alternate contention that the local government is a government of a United States territory or possession, within the meaning of the exclusionary clause in the Administrative Procedure Act, 5 U.S.C. 701(b)(1)(C).[2] Having concluded that the Trust Territory government was exempt from review under the APA, the district court reasoned that the same standards on the scope of review should be applied to NEPA, and concluded that the action of the High Commissioner in approving and executing the lease agreement was not 'federal' action covered by the National Environmental Policy Act, 42 U.S.C. 4332.[3]
 
 
 7
 We affirm these conclusions of the district court. See 356 F.Supp. at 649-661.[4]
 
 
 8
 We recognize, as did the district court, that several decisions have held governments of United States territories to be agencies of the federal government. However, these cases all involved a determination of agency for such purposes as income taxation, Bell v. Commissioner, 278 F.2d 100 (4th Cir. 1960), or the applicability of the Portal-to-Portal Act of 1947, Kam Koon Wan v. E. E. Black, Ltd., 188 F.2d 558 (9th Cir.), cert. denied, 342 U.S. 826, 72 S.Ct. 49, 96 L.Ed. 625 (1951).[5] Plaintiffs have not cited and we have not found a case applying APA judicial review provisions to the Trust Territory or applying even similar review standards to the civil government of any territory or possession.
 
 
 9
 We also recognize, again as did the district court, that the APA exclusionary clause excludes only 'the governments of the territories or possessions of the United States,' 5 U.S.C. 701(b)(1)(C), and that the Trust Territory is not a territory or possession, because technically the United States is a trustee rather than a sovereign. We agree with the district court that this distinction is immaterial, however, because the intent of Congress was to exclude from APA review all governments of this general type created pursuant to the authority of Congress.
 
 
 10
 Plaintiffs have cited several judicial decisions, a regulation, and one Tax Court decision stating that the Trust Territory is not a territory or possession of the United States. However, the holding of the judicial decisions is limited to the applicability of the Federal Tort Claims Act (see, e.g., Callas v. United States, 253 F.2d 838 (2d Cir.), cert. denied, 357 U.S. 936, 78 S.Ct. 1384, 2 L.Ed.2d 1550 (1958); Brunell v. United States, 77 F.Supp. 68 (S.D.N.Y.1948)), and the regulation and the Tax Court decision both involve federal income taxation. See Treas.Reg. 1.931-1(a)(1); Richard W. Benfer, 45 T.C. 277 (1965). We do not read these decisions and the regulation to be inconsistent with our conclusion that Congress intended the government of the Trust Territory, like that of territories and possessions, to be immune from judicial review under the APA.
 
 
 11
 Finally, we note that the Trusteeship Agreement, in which the United Nations designated the United States to be the administering authority of the Trust Territory, states that the United States shall 'promote the development of the inhabitants of the trust territory toward self-government * * *.' Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, art. 6(1), 61 Stat. 3301, 3302, T.I.A.S. No. 1665. This clear statement of intent on the part of the United Nations to foster self-government in the Trust Territory constrains us not to hold that the actions of the local government are reviewable in the same manner as the actions of domestic federal administrative agencies, in a federal district court several thousand miles from the islands.
 
 
 12
 For these reasons and for those expressed in the opinion of the district court, we affirm the conclusion of that court that neither the Trust Territory government nor the High Commissioner alone is a 'federal agency' as that term is used in making actions reviewable under the APA or NEPA.
 
 II. TRUSTEESHIP AGREEMENT
 
 13
 Plaintiffs also asserted below and assert here that the action of the governmental defendants in leasing public land to an American corporation against the expressed opposition of the elected representatives of the people of Saipan and without compliance with NEPA is a violation of their duties under the Trusteeship Agreement. The district court rejected this argument, holding that the Trusteeship Agreement did not vest the citizens of the Trust Territory with rights which they can assert in a district court.
 
 
 14
 We cannot accept the full implications of this holding. We do not dispute the district court's conclusion that compliance with NEPA was not required by the Trusteeship Agreement.[6] We do, however, disagree with the holding insofar as it can be read to say that the Trusteeship Agreement does not create for the islanders substantive rights that are judicially enforceable.
 
 
 15
 The district court relied for its conclusion on language in Pauling v. McElroy, 164 F.Supp. 390, 393 (D.D.C.1958), aff'd on other grounds, 107 U.S.App.D.C. 372, 278 F.2d 252, cert denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960). Pauling concerned an attempt to enjoin United States officials from proceeding with nuclear tests in the Marshall Islands, an area within the trusteeship. The controversy there, unlike the one here, involved the Trusteeship Agreement's grant of broad discretion to use the area for military purposes. See Trusteeship Agreement arts. 1, 5, 13, 61 Stat. 3301, 3302, 3304. We do not find Pauling to support the defendants' contention here that the plaintiffs cannot invoke the provisions of the Trusteeship Agreement to challenge the High Commissioner's power to lease local public land for commercial exploitation by private developers.
 
 
 16
 The right of Rhodesian and American citizens to maintain an action in the courts of the United States seeking enforcement of the United Nations embargo against Rhodesia was recently recognized in Diggs v. Shultz, 152 U.S.App.D.C. 313, 470 F.2d 461 (1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973). On the merits, the court denied specific relief because of Congressional action which was held to have abrogated the United Nations Security Council Resolution, but the right to seek enforcement in federal court was firmly established. That decision, if correct, suggests that the islanders here can enforce their treaty rights, if need be in federal court.[7]
 
 
 17
 Article 73 of the United Nations Charter, 59 Stat. 1031, 1048, T.S. No. 993 (1945), which discusses non-self-governing territories generally, provides:
 
 
 18
 'Members of the United Nations which have or assume responsibilities for the administration of territories whose peoples have not yet attained a full measure of self-government recognize the principle that the interests of the inhabitants of these territories are paramount, and accept as sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories, and, to this end:
 
 
 19
 'a. To ensure, with due respect for the culture of the peoples concerned, their political, economic, social, and educational advancement, their just treatment, and their protections against abuses * * *.'
 
 
 20
 See also United Nations Charter art. 76, describing the basic objectives of the trusteeship system. Although the plaintiffs have argued that these articles of the United Nations Charter, standing alone, create affirmative and judicially enforceable obligations, we assume without deciding that they do not.
 
 
 21
 However, pursuant to Article 79 of the Charter,[8] the general principles governing the administration of trust territories were covered in more detail in a specific trusteeship agreement for the Trust Territory of the Pacific Islands. See generally L. Goodrich, E. Hambro & A. Simons, Charter of the United Nations: Commentary & Documents 502 (3rd ed. 1969). Specifically, Article 6 of the Trusteeship Agreement requires the United States to 'promote the economic advancement and self-sufficiency of the inhabitants, and to this end * * * regulate the use of natural resources' and to 'protect the inhabitants against the loss of their lands and resources * * *.'
 
 
 22
 Defendants contend, though, that provisions of the Trusteeship Agreement, including Article 6, can be enfoced only before the Security Council of the United Nations.[9] We disagree, concluding that the Trusteeship Agreement can be a source of rights enforceable by an individual litigant in a domestic court of law.
 
 
 23
 The extent to which an international agreement establishes affirmative and judicially enforceable obligations without implementing legislation must be determined in each case by reference to many contextual factors: the purposes of the treaty and the objectives of its creators, the existence of domestic procedures and institutions appropriate for direct implementation, the availability and feasibility of alternative enforcement methods, and the immediate and long-range social consequences of self- or non-self-execution. See generally M. McDougal, H. Lasswell, & J. Miller, The Interpretation of Agreements and World Public Order; Principles of Content and Procedure passim (1967).
 
 
 24
 The preponderance of features in this Trusteeship Agreement suggests the intention to establish direct, affirmative, and judicially enforceable rights. The issue involves the local economy and environment, not security; the concern with natural resources and the concern with political development are explicit in the agreement and are general international concerns as well; the enforcement of these rights requires little legal or administrative innovation in the domestic fora; and the alternative forum, the Security Council, would present to the plaintiffs obstacles so great as to make their rights virtually unenforceable.
 
 
 25
 Moreover, the Trusteeship Agreement constitutes the plaintiffs' basic constitutional document (see Parry, The Legal Nature of Trusteeship Agreements, 27 Brit. Year Book Int'l L. 164, 182-84 (1950), excerpted in 1 M. Whiteman, Digest of International Law 893 (1963), and is codified into the law of the Trust Territory, 1 T.T.C. 101(1). For all these reasons, we believe that the rights asserted by the plaintiffs are judicially enforceable. However, we see no reason why they could not and should not have been enforced in the High Court of the Trust Territory. The district court found that:
 
 
 26
 '* * * The lease approval was a 'local' decision of the High Commissioner acting within the scope of his duties as chief executive of the Trust Territory Government. The officials of the Interior Department did not negotiate, counsel, advise or participate in the decision. Nor was the lease ever sent to the Department for approval or concurrence in any form * * *.' 356 F.Supp. at 657 n.28.
 
 
 27
 Surely, the judicial branch of the Trust Territory government has the authority to determine whether or not the action of its chief executive complies with a provision in its own constitutional document.
 
 
 28
 We recognize that the Trusteeship Agreement purports to obligate the United States, not the individual who happens to be High Commissioner. Nonetheless, because of the process of his appointment,[10] the High Commissioner has the responsibility to act in a manner consistent with the duties assumed by the United States itself in the Trusteeship Agreement.
 
 
 29
 Thus, although we hold that the Trusteeship Agreement is a source of individual legal rights, we also hold that, in a case involving actions by the High Commissioner within the scope of his duties as chief executive, these rights are not initially enforceable in United States courts. Rather, upon principles of comity, they should be asserted before the High Court of the Trust Territory.
 
 
 30
 Admittedly, the substantive rights guaranteed through the Trusteeship Agreement are not precisely defined. However, we do not believe that the agreement is too vague for judicial enforcement. Its language is no more general than such terms as 'due process of law,' 'seaworthiness,' 'equal protection of the law,' 'good faith,' or 'restraint of trade,' which courts interpret every day. Moreover, the High Court can look for guidance to its own recently enacted environmental quality and protection act, T.T.Pub.L. No. 4C-78 of Apr. 14, 1972, codified at 63 T.T.C. 501-509, to the relevant principles of international law and resource use which have achieved a substantial degree of codification and consensus (see Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)), and to the general direction, although not necessarily the specific provisions, of NEPA.
 
 
 31
 Cf. Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F.Supp. 252 (D.D.C.1972). These sources should provide a sufficiently definite standard against which to test the High Commissioner's approval of a 50-year lease of unique public lands to an American corporation, allegedly in disregard of the protests of the islands' elected officials and without a showing of consideration of cultural and environmental factors.
 
 
 32
 Since the High Commissioner claims to have been acting pursuant to local statutes when he approved the lease to Continental, if the High Court finds that his action violated provisions of the Trusteeship Agreement, that court may have to declare these statutes void either on their face or void as applied by the High Commissioner. The order of the United States Department of the Interior which established the structure of the Trust Territory government forbids the legislative branch of the Trust Territory government from enacting any legislation inconsistent with 'treaties or international agreements of the United States * * *.' Dept. of Interior Order No. 2918, pt. III, 2(a) (1968). Because the Trusteeship Agreement is an international agreement of the United States, local legislation inconsistent with it must fall.
 
 
 33
 Although the High Court has held that it lacks jurisdiction over an agency of the United States or its officers in the Trust Territory (see Schulz v. Peace Corps, 4 T.T.R. 428 (1969)), the Secretary of the Interior assures us that his department did not participate in any way in the decision to grant a lease to Continental, and, hence, that Schulz will not bar the High Court from hearing and deciding this case. If, in the proceedings before the High Court, it should appear that the actions of the High Commissioner cannot be effectively reviewed and tested against the duties assumed by the United States in the Trusteeship Agreement, either because his actions were controlled by a directive or regulation of the Secretary of the Interior which the High Court considers nonreviewable or because the High Court does not agree that it has the power to review the High Commissioner's actions against the standards established in the Trusteeship Agreement, then the plaintiffs may refile this action in the United States District Court for the District of Hawaii.
 
 
 34
 We recognize that the High Court has said earlier that the Trusteeship Agreement does not create a trust capable of enforcement through the courts. See Alig v. Trust Territory of the Pacific Islands, 3 T.T.R. 603, 615-16 (1967). We also recognize that, unless the High Commissioner acted unconstitutionally of in violation of the law, the suit against him might not be cognizable in the Trial Division of the High Court because of the doctrine of soverign immunity. See also 6 T.T.C. 252(2). Nonetheless, the High Court is free to re-evaluate its position with regard to the enforceability of the provisions of the Trusteeship Agreement under Diggs v. Shultz, supra.[11] It may conclude, as we did, that as the judicial branch of a political entity possessing many of the attributes of an independent nation, that court has the power to hear a claim that the islands' chief executive officer has violated terms of the Trusteeship Agreement. If the High Court reaches this conclusion, the doctrine of sovereign immunity would provide no basis for refusing to hear the action. See Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-690, 701-702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).
 
 
 35
 We hold, then, that the plaintiffs must initially pursue their remedies in the local court. If our assumption that the High Court has the power to review the decision of the High Commissioner proves to be invalid, then the federal district court must assume jurisdiction of this case. We refuse to leave the plaintiffs without a forum which can hear their claim that the High Commissioner has violated the duties assumed by the United States in the Trusteeship Agreement.
 
 
 36
 Because it is possible that we may see this case again, we comment briefly on one issue raised by the defendants. Continental contends that it has acquired some equities by proceeding with the construction of its hotel while its right to do so is being litigated. Unless we misread the argument, Continental seems to be asserting that the damage has been done, and that it is too late for courts to remedy it. We note that Continental initiated bulldozing activities at the Micro Beach without notice and while the High Commissioner supposedly was giving further consideration to the project. The plaintiffs' action was commenced in the High Court almost immediately afterward, and in federal court within one and one-half months. We caution Continental that:
 
 
 37
 '* * * After a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided * * *.' Jones v. S.E.C., 298 U.S. 1, 17, 56 S.Ct. 654, 658, 80 L.Ed. 1015 (1936), quoted in Nat'l Forest Preservation Group v. Butz, 485 F.2d 408, 411 (9th Cir. 1973).
 
 
 38
 The judgment of dismissal is affirmed as modified.
 
 TRASK, Circuit Judge (concurring):
 
 39
 I join in the decision of the majority but follow a different course to the common conclusion.
 
 
 40
 First of all, it appears clear to me that the Charter of the United Nations is not self-executing and does not in and of itself create rights which are justiciable between individual litigants. Although under Article VI of the Constitution[1] treaties are part of the supreme law of the land, it was early held that to be immediately binding upon our courts a treaty must be self-executing. Chief Justice Marshall enunciated this principle in Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829):[2]
 
 
 41
 'Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract-- when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract, before it can become a rule for the court.'
 
 
 42
 Unless a treaty is self-executing, in order to be cognizable before the courts it must be implemented by legislation. Otherwise it constitutes a compact between sovereign and independent nations dependent for its recognition and enforcement upon the honor and the continuing self-interest of the parties to it. If, however, the treaty contains language which confers rights or obligations on the citizenry of the compacting nations then, upon ratification, it becomes a part of the law of the land under Article VI. In Head Money Cases, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), the Court said:
 
 
 43
 'A treaty, then, is the law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.' 112 U.S. at 598-599, 5 S.Ct. at 254.
 
 
 44
 I find nothing in a reading of the Charter and nothing has been called to my attention which would persuade me to believe that the Charter itself creates individual rights which may be enforced in the courts.[3] There is little definitive case law elucidating the issue of self-implementation vel non. The appellants have referred to some of the cases in which reference to the Charter has been made.[4]
 
 
 45
 Those cases are of questionable precedential value. Looking in the opposite direction we find cases that are subject to much the same criticism. The only case which straightforwardly holds in broad terms that the Charter is not self-executing is Pauling v. McElroy, 164 F.Supp. 390 (D.D.C.1958), aff'd per curiam on other grounds, 101 U.S.App.D.C. 372, 278 F.2d 252, cert. denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960). The District Court in Pauling stated:
 
 
 46
 'The provisions of the Charter of the United Nations, the Trusteeship Agreement for the Trust Territory of the Pacific Islands, and the international law principle of freedom of the seas relied on by plaintiffs are not self-executing and do not vest any of the plaintiffs with individual legal rights which they may assert in this Court. The claimed violations of such international obligations and principles may be asserted only by diplomatic negotiations between the sovereignties concerned.' 164 F.Supp. 393.
 
 
 47
 In Hitai v. Immigration & Naturalization Service, 343 F.2d 466, 468 (2d Cir. 1965), the court held that Article 55 of the Charter was not self-executing. Both from the standpoint of the inherent nature of treaty obligations and what appears to me to be a plain reading of the language of the Charter, I would hold it to be a compact between sovereign nations neither intending to impart justiciable rights to individuals nor implicitly doing so.
 
 
 48
 This position is fortified, it would seem, by the very fact that the Charter provided for a system of trusteeship. Chapter XI, which contains Article 73, is a mutual declaration of the members of their responsibilities for the administration of territories whose peoples have not yet attained a complete competence of self-government. Chapter XII and Chapter XIII then provide for the International Trusteeship System for the administration and supervision of those territories. Under those Articles a Trusteeship Agreement was executed between the Security Council of the United Nations and the United States, as administering authority effective July 18, 1947, for the Territory of the Pacific Islands.[5] It provided the United States with the authority to enact a comprehensive system of government under Article 6.[6]
 
 
 49
 Congress has empowered the President with authority for the civil administration of the Territory until Congress itself should further establish a system of government. 48 U.S.C. 1681. Under this statutory basis, a series of Executive orders delegated responsibility for government to the Department of the Interior, see Exec. Order No. 11,021, 3 C.F.R. 600 (1959-63 Comp.), 48 U.S.C. 1681, and that Department eventually promulgated a single document combining previous orders into one basic order for the Government of the Trust Territory of the Pacific Islands. Dept. of Interior Order No. 2918, Dec. 27, 1968, 34 Fed.Reg. 157 (1969). This consolidated order constituted a mini-organic act creating legislative, executive, and judicial branches of the Government with a Congress, a High Commissioner as the Chief executive, and a High Court of the Trust Territory with a Chief Justice and Associate Justices appointed by the Secretary of the Interior.
 
 
 50
 I agree with the federal appellees and with the court in Pauling v. McElroy, supra, that the Trusteeship Agreement is not self-executing.[7] Yet, a series of actions all ultimately founded upon congressional authority have so executed the Agreement that its provisions may now properly be regarded as judicially enforceable. Thus, the Agreement was approved by the President pursuant to a joint resolution of Congress, see note 5 supra, and implemented by Executive orders promulgated pursuant to congressional authority, 48 U.S.C. 1681. Finally, the Trust Territory Government, created by the Department of the Interior, has declared the Agreement 'to be in full force and to have the effect of law in the Trust Territory.' 1 T.T.C. 101(1).
 
 The Trust Territory Code provides:
 
 51
 'The Trial Division of the High Court shall have original jurisdiction to try all causes, civil and criminal, including probate, admiralty, and maritime matters and the adjudication of title to land or any interest therein.' 5 T.T.C. 53.
 
 
 52
 All decisions rendered in such matters are subject to review by the Appellate Division under 55 T.T.C. 54(1)(a). It thus appears to me as it does to the majority that jurisdiction does lie with the High Court to determine the validity of the lease in accordance with its own law and any other law affecting the lease or the lands to which the lease is applicable. Based upon considerations of comity, I agree that this cause should initially be addressed to the High Court.
 
 
 
 *
 The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The High Court concluded that the Trust Territory government was not a 'federal agency' and that the High Commissioner, acting as its chief executive officer, was not subject to NEPA. The court relied primarily upon the prior determination of the Secretary of the Interior that 'territorial governments, under the jurisdiction of the Secretary of the Interior, are not agencies or instrumentalities of the executive branch of the Federal Government * * * (and) that the territorial governments are not organized entities of the Department of the Interior.' Dept. Manual of Dept. of Interior 150.1.4
 
 
 [2]
 'For the purpose of this chapter--
 '(1) 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--
 '* * * *ncy
 '(C) the governments of the territories or possessions of the United States * * *.' 5 U.S.C. 701(b).
 
 
 [3]
 'The Congress authorizes and directs that, to the fullest extent possible: * * * all agencies of the Federal Government shall--
 '* * * *res
 '(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented * * *.' 42 U.S.C. 4332.
 
 
 [4]
 See also Vermilya-Brown Co. v. Connell, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948), in support of the conclusion that NEPA applies to federal agencies operating in the Trust Territory
 
 
 [5]
 But see Porter v. United States, 496 F.2d 583 (Ct.Cl.1974), holding that the Trust Territory government was not an agency of the United States for the purpose of asserting jurisdiction against the United States for an alleged breach of a contract negotiated by officials of the Trust Territory government
 
 
 [6]
 Article 12 of the Trusteeship Agreement empowers the United States to 'enact such legislation as may be necessary to place the provisions of this agreement in effect in the trust territory.' Our conclusion that the actions of the Trust Territory government are not subject to NEPA is an equivalent way of saying that Congress has not, pursuant to Article 12, legislated to make NEPA applicable to the Trust Territory government. Hence, in approving the lease agreement, the High Commissioner was under no obligation to comply with NEPA. This is the same conclusion as that reached by the High Court. See note 1, supra
 
 
 [7]
 See Note, 14 Va.J.Int'l L. 185 (1973), which comments upon Diggs v. Shultz
 
 
 [8]
 'The terms of trusteeship for each territory to be placed under the trusteeship system, including any alteration or amendment, shall be agreed upon by the states directly concerned, including the mandatory power in the case of territories held under mandate by a Member of the United Nations, and shall be approved as provided for in Articles 83 and 85.' United Nations Charter art. 79, 59 Stat. 1031, 1049
 
 
 [9]
 Unlike the other ten trusteeships set up after World War II, pursuant to agreements between the United Nations and various nations, the Trust Territory was designated as a 'strategic' trust. Trusteeship Agreement art. 1, 61 Stat. 3301. See 1 M. Whiteman, Digest of International Law 766. This designation results in the United States being responsible to the Security Council for the administration of the Trust Territory-- where the United States possesses veto power (United Nations Charter art. 27, 59 Stat. 1041)-- rather than to the General Assembly. United Nations Charter art. 83(1), 59 Stat. 1050
 
 
 [10]
 Article 12 of the Trusteeship Agreement of 1947 authorized the United States to enact such legislation as may be necessary to implement the agreement. 61 Stat. 3304. At first, President Truman gave the Navy administrative responsibility for the islands. Exec. Order No. 9875, 12 Fed.Reg. 4837 (1947), 3 C.F.R. 658 (1943-48 Comp.). In 1951 administration of the islands was transferred to the Department of the Interior. Exec. Order No. 10265, 16 Fed.Reg. 6419 (1951), 3 C.F.R. 766 (1949-53 Comp.). During the next two years, responsibility for administration of parts of the Trust Territory was redelegated back to the Secretary of the Navy. Exec. Order No. 10408, 17 Fed.Reg. 10277 (1952), 3 C.F.R. 906 (1949-53 Comp.); Exec. Order No. 10470, 18 Fed.Reg. 4231 (1953), 3 C.F.R. 951 (1949-53 Comp.). Not until 1954 did Congress begin to legislate to implement the Trusteeship Agreement, and then it merely stated that, until it provided further for its government, all governmental authority in the Trust Territory rested with the President. Act of June 30, 1954, ch. 423, 1, 68 Stat. 330, as amended, 48 U.S.C. 1681(a). Finally, in 1962 President Kennedy redelegated his authority for civil administration of the entire Trust Territory to the Secretary of the Interior. Exec. Order No. 11021, 27 Fed.Reg. 4409 (1962), 3 C.F.R. 600 (1959-63 Comp.). The Secretary of the Interior, in turn, delegated executive authority for the Trust Territory to the High Commissioner:
 'The executive authority of the Government of the Trust Territory, and the responsibility for carrying out the international obligations undertaken by the United Nations with respect to the Trust Territory, shall be vested in a High Commissioner of the Trust Territory and shall be exercised and discharged under the supervision and direction of the Secretary.' Dept. of Interior Order No. 2918, pt. II, 1, 34 Fed.Reg. 157 (1969).
 Meanwhile, in 1967 Congress provided that this High Commissioner shall be appointed by the President and confirmed by the Senate. Act of May 10, 1967, Pub.L.No.90-16 2, 81 Stat. 15, codified, 48 U.S.C. 1681a. See generally Note, A Macrostudy of Micronesia: The Ending of a Trusteeship, 18 N.Y.L.F. 139 (1972).
 Thus, as the district court here observed, the High Commissioner's authority 'does not come from the people of the Trust Territory, nor do they have any method of removing him when dissatisfied with his actions or policies.' 356 F.Supp. at 655. See also Societa A.B.C. v. Fontana & Della Rocca, (1955) I.L.R. 76 (Court of Cassation, United Chambers, Italy 1954), quoted at 1 M. Whiteman, Digest of International Law 870-71, which held that the Italian Trusteeship Administrator for Somaliland derived his authority from the Italian state and, hence, was an organ of that state.
 
 
 [11]
 'Appellees suggest that the prospects of significant relief by means of the embargo are so slight that this relationship of intended benefit is too tenuous to support standing. But this strikes us as tantamount to saying that because the performance of the United Nations is not always equal to its promise, the commitments of a member may be disregarded without having to respond in court to a charge of treaty violation. It may be that the particular economic sanctions invoked against Southern Rhodesia in this instance will fall short of their goal, and that appellants will ultimately reap no benefit from them. But, to persons situated as are appellants, the United Nations action constitutes the only hope; and they are personally aggrieved and injured by the dereliction of any member state which weakens the capacity of the world organization to make its policies meaningful.' Diggs v. Shultz, 470 F.2d at 465
 
 
 [1]
 'This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' U.S. Const. art. VI
 
 
 [2]
 The decision in Foster was overruled by United States v. Percheman, 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1883), in an opinion also written by Chief Justice Marshall when new facts were brought to bear upon the controversy, but the legal principle announced in Foster was not undermined. See Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 10, 57 S.Ct. 100, 81 L.Ed. 5 (1936); Head Money Cases, 112 U.S. 580, 598-599, 5 S.Ct. 247, 28 L.Ed. 798 (1884); L. Henkin, Foreign Affairs and the Constitution 156-58 (1972); Comment, Criteria for Self-Executing Treaties, 1968 U.Ill.L.F. 238, 239
 
 
 [3]
 The fact that a treaty was ratified by the President of the United States upon the advice and consent of two-thirds of the Senate, as was the United Nations Charter (Charter of the United Nations, June 26, 1945, 59 Stat. 1031, 1213, T.S.No.993 (effective Oct. 24, 1945)), makes it a commitment of the nation but does not necessarily impart rights and obligations to individual citizens
 
 
 [4]
 In concurring opinions in Oyama v. California, 332 U.S. 633, 649-650, 673, 68 S.Ct. 269, 92 L.Ed. 249 (1948), Justices Black, Douglas, and Murphy intimate that Articles 55 and 56 of the Charter support a position proscribing racial discrimination; a dissenting opinion in Hurd v. Hodge, 82 U.S.App.D.C. 180, 162 F.2d 233, 245 (1947), rev'd, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948), is much the same. In an appeal from a contempt-of-Congress conviction for the refusal of a United Nations' employee to answer whether anyone had aided her in obtaining employment, Article 105 was discussed but the actual decision was based upon other grounds. Keeney v. United States, 94 U.S.App.D.C. 366, 218 F.2d 843, 845 (1954). Diggs v. Shultz, 152 U.S.App.D.C. 313, 470 F.2d 461 (1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973), was a case in which the plaintiffs sought relief against the Secretary of the Treasury because of an official authorization of importation of metals contrary to the terms of a United Nations' embargo in which the United States had joined. Relief was denied because of the nonjusticiability of the claim under the separation-of-powers doctrine, although the court did hold that the plaintiffs had standing to litigate the issue of the failure of the defendants to adhere to the Government's treaty obligations. In Diggs, however, the relevant provision of the Charter, Article 41, had been implemented by Congress through the enactment of 22 U.S.C. 287c, which authorizes the President to effectuate Article 41 sanctions and prescribes criminal penalties for those individuals disobeying such Presidential orders. Indeed, pursuant to this statutory authority, the President had issued Executive orders banning the importation of the items in question. Exec. Order No. 11,419, 3 C.F.R. 737 (1966-70 Comp.), 22 U.S.C. 287c; Exec. Order No. 11,322, 3 C.F.R. 606 (1966-70 Comp.), 22 U.S.C. 287c; see Diggs v. Shultz, 470 F.2d at 463
 
 
 [5]
 Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665. The Agreement was approved by the President on July 18, 1947, pursuant to the authority of a joint resolution of Congress of the same date. 61 Stat. 397 (1947)
 
 
 [6]
 Trusteeship Agreement, art. 12. Article 6 provides in pertinent part that the administering authority (the United States) shall:
 '1. foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self-government or independence . . .;
 '2. promote the economic advancement and self-sufficiency of the inhabitants . . .;
 '3. promote the social advancement of the inhabitants . . .; and
 '4. promote the educational advancement of the inhabitants . . ..'
 
 
 [61]
 Stat. at 3302-3303
 
 
 [7]
 The language of the Agreement, and in particular that of Article 6, the specific provision at issue in this suit, evinces a series of general commitments undertaken by the United States in furtherance of particular social objectives. See note 6 supra. That these phrases may become workable through judicial construction, as the majority opines, does not detract from the probability that, had the drafters of the instrument intended the document to have the effect of a statute, more precise language delimiting the rights of Micronesians would have been employed. Compare Head Money Cases, 112 U.S. 580, 598-599, 5 S.Ct. 247, 28 L.Ed. 798 (1884); Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1879). Moreover, the Agreement, in Article 12, states:
 'The administering authority shall enact such legislation as may be necessary to place the provisions of this agreement in effect in the trust territory.'
 Since, under the Constitution of the 'administering authority' (the United States), self-executing treaties are effective upon ratification, this provision, as drafted, would not have been necessary had the drafters intended the Agreement to be self-executing.