**Decision on remand to the Commonwealth Trial Court, August 2, 1985**

**Affirmed, Appellate Division of District Court, November 14, 1986**

657

658

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

APPELLATE DIVISION

| | | |
|---|---|---|
| FRANCISCA T. PALACIOS, | ) | CIVIL APPEAL NO. 81-9017 |
| Plaintiff-Appellant, | ) | (CTC CIV. NO. 79-204-A) |
| vs. | ) | |
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, MARIANAS PUBLIC LAND CORPORATION, SANTIAGO C. TUDELA, and THE TRUST TERRITORY OF THE PACIFIC ISLANDS, | ) | OPINION |
| Defendants-Appellees. | ) | |

BEFORE: LAURETA and GILLIAM, District Judges and SOLL, Designated Judge*

LAURETA, District Judge

## I. STATEMENT OF THE CASE/FACTS

Plaintiff-Appellant Francisca T. Palacios appeals the lower court's grant of summary judgment to the Commonwealth of the Northern Mariana Islands (CNMI), the Marianas Public Land

*Honorable Herbert D. Soll, Commonwealth Trial Court Associate Judge sitting by designation pursuant to 48 U.S.C. § 1694b.

659

Corporation (MPLC) and the Trust Territory of the Pacific Islands (TTPI).[1] Palacios seeks compensation under the Trusteeship Agreement[2] and the Trust Territory Bill of Rights' due process clause[3] for the 1944 taking by the United States of land owned by Palacios' now-deceased father, Juan Tudela. The lower court granted summary judgment on the ground that Palacios' claim accrued in 1951 and became time-barred in 1971 under the twenty-year limitations statute applicable to land actions (6 TTC § 301(1)(b)).

Juan Tudela owned Tanapag property across which United States Military forces built a road in 1944. The road is Route 3, which is commonly called Beach Road. The United States transferred the property to the TTPI, which subsequently transferred the property to the CNMI. Pursuant to CNMI Constitution Article XI, the MPLC asserts title to the land. It is undisputed that Tudela never received condemnation compensation for the taking.

On October 29, 1953, the TTPI issued Land Title Determination No. 729. Determination 729 named Juan Tudela as owner of Lot 452 and the part of Lot 453 lying west of the highway built

─ ─ ─ ─ ─ ─ ─ ─ ─ ─

[1]Defendant Santiago Tudela, Palacios' brother, owns a half-interest in the disputed land. He was brought in as an · indispensable party under Commonwealth Civil Procedure Rule 19 (TR 49). He did not move for summary judgment below and is not involved in this appeal.

[2]Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665.

[3]1 Trust Territory Code (TTC) § 1 et. seq.

in 1944. Annex A attached to the Determination contained a specific reservation of the TTPI's rights in the road. Neither Tudela nor appellant contested the Determination as permitted by Land Management Regulation No. 1.

Juan Tudela died in 1972. Appellant and defendant Santiago Tudela are Juan's sole heirs. On June 30, 1975, the Micronesian Claims Commission issued Decision No. 6630 concerning the Tudela property. Title II of the Decision awarded Santiago, as representative of his father's heirs, approximately $8,500 in compensation for past and present government use of the subject property. When Santiago subsequently refused this portion of the award, the Commission amended its Decision to reflect the refusal. Appellant filed this action on November 2, 1979.

## II. ISSUES

A. Whether the TTPI is precluded from asserting a statute of limitations defense because of its "trustee" relationship with the corresponding obligations to plaintiff under the Trusteeship Agreement.

B. Whether laches bars the action against the TTPI.[4]

C. Whether the statute of limitations barred the action against the CNMI and MPLC.

- - - - - - - - - -

[4]The TTPI affirmatively pleaded this defense below. No party briefed or raised the issue on appeal. See pp. 17-18, infra.

661

III.  DISCUSSION

A.  TTPI

Courts recognize that between a trustee and a beneficiary "a statute of limitations has no application and no length of time is a bar" to suit against the trustee absent laches by the beneficiary or the trustee's repudiation of the trust.  E.g., Connell v. U.S. Steel Corp., 516 F.2d 401, 408 (5th Cir. 1975) [citing Restatement, Second, Trust § 219 (1959)]; accord, Manchester Ban of Pomo Industries, Inc. v. U.S., 363 F.Supp, 1238, 2149 (N.D.Calif. 1973)(applying the principle above against the United States in a suit by Indians for mismanagement of tribal funds).[5] See also Chisholm v. House, 183 F.2d 698, 706 (10th Cir. 1950) (applying the principle above on behalf of deceased Indian trust settlor's beneficiaries on the ground that the Indian decedent was "justifiably ignorant" of a breach of trust due to decedent's inability to read or speak English and consequent inability to meaningfully challenge the breach).  Citing both California law and federal decisions, Judge Renfrew correctly noted in Manchester that this "universal rule" applies to fiduciary relationships in general.  363 F.Supp. at 1249.  See also Anno., Fiduciary or Confidential Relationship As Affecting Estoppel to Plead Statute of Limitations, 45 A.L.R.3d 630.  Thus, even if the TTPI is correct that the Trusteeship Agreement does not create an "express trust", the Court may apply the rule above to the TTPI, if a fiduciary relationship is found.

— — — — — — — — —

[5] In Manchester the court recognized that under Supreme Court precedent the United States as trustee is subject to the same standards as a private trustee.  363 F.Supp. at 1245.

662

Notwithstanding the TTPI's contrary indications, this universal rule has been engrafted into the Trust Territory law. In 1952 the High Commissioner[6] promulgated a statute now codified as 1 TTC § 103. After the Interior Secretary created the Congress of Micronesia in 1965, the Congress of Micronesia re-enacted § 103 in 1966. In both instances, the adoption of § 103 occurred contemporaneously with the promulgation of the limitations statute upon which the TTPI relies.

Section 103 specifically adopts the American Law Institute's Restatements of the Law as Trust Territory law in the absence of contrary superceding statute or indigenous customary law. Under Restatement (Second) Trusts § 219(2)(1959), a "benefi-ciary is not barred merely by the lapse of time from enforcing the trust, but if the trustee repudiates the trust to the knowledge of the beneficiary, the beneficiary may be barred by laches from enforcing the trust." (emphasis added)

The TTPI's scholarly argument can be reduced to funda-mentally one proposition. That proposition is that the Trustee-ship Agreement does not create a common law express "trust" not-

_ _ _ _ _ _ _ _ _

[6]The High Commissioner is the United States official appointed as chief executive of the Trust Territory. Prior to 1967 the Interior Secretary appointed the High Commissioner. Since 1967 the President has appointed the High Commissioner with the advice and consent of the Senate. See 48 U.S.C. § 1681(a). See generally People of Saipan v. U.S. Department of the Interior, 502 F.2d 90, 98 n.10 (9th Cir. 1974), cert.denied 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). The High Commissioner exercised all territory-wide legislative power until the Interior Secretary created the Congress of Micronesia in 1965.

withstanding the fact that United States officials drafted the Trusteeship Agreement[7] with the "sacred trust" language of U.N. Charter Article 73 specifically in mind.[8] This argument fails for several reasons.

## 1.

First, at least two judicial decisions have accepted or implied the characterization of the TT-Micronesian relationship under the Trusteeship Agreement as a trust. In People of Saipan v. U.S. Department of the Interior, 502 F.2d 90, 96 (9th Cir. 1974), cert.denied 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975), the 9th Circuit decided that the Trusteeship Agreement confers judicially enforceable rights in favor of Micronesians. In so holding the court specifically contrasted its view with what it identified as the TTPI High Court's contrary position that the Trusteeship Agreement "does not create a trust capable of judicial enforcement." 502 F.2d at 99. Although the judicial enforceability issue before the court did not require it to definitively categorize the Trusteeship Agreement, the statement above strongly indicates the court's implicit assumption that the instrument creates a trust. A thorough law review analysis of People of Saipan and pre-existing law also concludes that the 9th Circuit unequivocally "repudiated" the High Court's characterization of the Trusteeship Agreement as a "non-trust." D. Olsen,

_ _ _ _ _ _ _ _ _ _

[7] The Trusteeship Agreement was drafted by the State, War and Navy Departments with the assistance of the Joint Chiefs of Staff. S.Rep. No. 471, 80th Cogn. 1st Sess. 3 (1947).

[8] United Nations Security Council Official Record (113th Meeting) at 411-412 (1947)(Statement of United States Ambassador Austin).

Piercing Micronesia's Colonial Veil, 15 Columbia J. of Transnat'l L. 473, 493 (1976). While the TTPI ascribes considerable significance to the court's description of the Trusteeship Agreement as a "treaty", an "international agreement" or a "basic constitutional document," the TTPI never convincingly explains away the significance of the 9th Circuit's distinction of the High Court's contrary view on the trust enforceability question. In <u>Gale v. Andrus</u>, 643 F.2d 826, (D.C.Cir. 1980), the court unmistakably characterized the relationship as a formal trust:

> The ultimate fact of importance to this Court is that the entire authority of the United States is derived from a <u>trust</u>. And, it is clear... that it is a very unique trusteeship agreement that differs widely from any of the traditional relationships of governmental entities... Like all trusts, there must be a trustee to supervise the management of the property within the trust. Yet, the authority of the trustee is never any greater than that with which it was endowed by the trust government... If one fails to appreciate the true charateristics of this unique relationship... it is easy to get lost... trying to pigeonhole or label this entity called "Micronesia." However, we believe that if the <u>trust</u> aspects of the relationship are properly emphasized, the law... can be applied and affirmed.

<u>Id.</u> at 830 (emphasis on original). <u>Gale</u> reasserted what the court had stated in <u>Ralpho v. Bell</u>, 569 F.2d 607 (D.C.Cir. 1977):

> "Of course, the United States does not hold the Trust Territory in fee simple, as it were, but rather as a trustee." 569 F.2d at 619.

2.

Second, a 1948 law promulgated by the TTPI itself explicitly affirmed that the Trusteeship Agreement creates a common law trust, especially with respect to the Article 6.2 obligation to protect the indigenous populace against the loss of their lands. Interim Regulation No. 4-48 by adding a Section 12 dealing with alien property.[9] Section 12, Article I(c) specifically acknowledges the TTPI's obligation to protect the Trust Territory's inhabitants against the loss of their lands. Article I(d) continues:

> "(d) The powers granted to the Administering Authority under the Trusteeship Agreement are very broad. The Administering Authority must, of necessity, assume many of the powers and obligations inherent to a common law trustee. These powers include, with reference to the assets of the trust, the power to incur expenses, power to lease, power of sale, and the power to compromise, arbitrate and abandon claims." (emphasis added)

3.

Third, the Trusteeship Agreement satisfies the objective test for trust creation under the Restatement (Second) of Trusts which the TTPI itself made part of the Trust Territory law. Under Restatement § 2, the following elements are required to create an express trust: (1) trust property; (2) a trust beneficiary; (3) a trustee who holds the trust property subject

— — — — — — — — —

[9] The alien property provisions of 6-48 were re-enacted, periodically revised and now appear as 27 TTC § 1 et seq.

to equitable duties to serve the trust beneficiaries; and (4) a manifestation of intent to create a trust.

At least with respect to the Article 6.2 duty to safeguard Trust Territory inhabitants against the loss of their lands, the Trusteeship Agreement amply qualifies as a "trust" under those criteria. The trust property or _res_ obviously is _the land_ of the Trust Territory's various islands. As noted above, _Gale v. Andrus_ specifically recognized this. 643 F.2d at 830. The United States and its delegates, particularly the TTPI, are the trustees. _Id._. The inhabitants of the TTPI are the beneficiaries. _Id._. The Restatement instructs that the intent to create a trust is manifested by "an intention to create enforceable duties." Restatement § 23, comment a. The 9th Circuit recently affirmed that "(i)n deciding whether a trust has been created, the crucial question is whether the settlor manifested an intention to impose upon himself or upon a transferee of the property equitable duties to deal with the property for the benefit of another person." _Moose v. U.S._, 674 F.2d 1277, 1281 n.7 (9th Cir. 1982)(emphasis added). As the TTPI concedes, the 9th Circuit's _People of Saipan_ decision stands squarely for the proposition that the Trusteeship Agreement objectively manifests the intention to create "direct", "affirmative" and judicially enforceable rights in favor of Micronesians, particularly with respect to the Article 6.2 "land loss protection" obligation implicated in that decision. 502 F.2d at 96. Although the TTPI attempts to distinguish itself from the United States

government for purposes of Trusteeship Agreement analysis, the 9th Circuit clearly decided in People of Saipan that the TTPI's chief executive, the High Commissioner, is as bound as the United States itself by the Agreement.  Id. at 98.

The relationship defined by the Trusteeship Agreement is precisely the type of relationship which the Restatement describes as fiduciary:

> "A person in a fiduciary relation to another is under a duty to act for the benefit of another as to matters within the scope of the relation."  Restatement, Trusts, § 2, comment b.

The TTPI's supplemental brief candidly admits that as early as 1943 the United States characterized the future trusteeship system as creating a "special responsibility" in the administering nation "analogous to that of a trustee or fiduciary." (Defendant-Appellee's Supplemental Brief, p. 25)  Attempting to discredit Palacios' reliance upon Indian law cases which articulate fiduciary doctrines, the TTPI devotes considerable effort to an attempt to distinguish the Indian and Micronesian relationships with the United States; this attempt is unpersuasive.

The very purposes which engendered the judicially created Indian fiduciary doctrine apply a fortiori to the Micronesian-U.S. relationship.  Citing case law and Chambers, Judicial Enforcement of the Federal Trust Responsibility to Indians, 27 Stan.L.Rev. 1213 (1975), the TTPI observes that "(t)he relationship of Indians to the United States was adduced by the Supreme

668

Court to support a liberal reading of Indian treaties." (Supplemental Brief at 21)  As the Chambers article and the TTPI's cases disclose, the policy consideration which influenced courts was that Indians had come uner federal "guardianship" due to unfairly negotiated treaties after conquest, and therefore the United States had a trust responsibility to these "dependent people." Id.. The congressional hearing and reports on the Trusteeship Agreement which the TTPI provides us express a similar sense of responsibility for a Micronesian populace assimilated by war conquest into the U.S. control.  Even stronger statements of obligation by the U.S. appear in the Security Council debates on approval of the Trusteeship Agreement. E.g., People of Enewetak v. Laird, 353 F.Supp. 811, 817 (D.Haw. 1973)(quoting Security Council debates).  The only meaningful difference from the Indian situation is that the Trusteeship Agreement, unlike Indian treaties, was an instrument which the "dependent people" lacked even a nominal role in negotiating.  Unlike the classic Indian-U.S. "treaty" relationship, the trusteeship relationship was thrust upon Micronesians by the United States without their colorable participation or consent.

The analogy between the Micronesian trusteeship relationship and the Indian relationship has been judicially recognized. In People of Saipan, the district court described the trusteeship as a "trust relationship" to which the Indian analogy was "apt." 356 F.Supp. at 660.  The court did not apply correlative fiduciary doctrines to the merits because it concluded as a threshold

matter that the Trusteeship Agreement under which plaintiffs sued was judicially unenforceable. Id.. The 9th Circuit disagreed with that threshold ruling and, as indicated above, held that the Trusteeship Agreement is judicially enforceable. Other courts have applied the "Indian analogy" in holding that the United States occupies a fiduciary relationship with Native dependent peoples other than Indians over which it assumes control. E.g., Eric v. Secretary of HUD, 464 F.Supp. 44, 46-47 (D.Alaska 1978) (Alaska Natives).

The TTPI's attempts to functionally equate itself with conventional American territorial governments is unpersuasive. The TTPI's basic thesis is that the TTPI, like a conventional territorial government, stands merely in a relation of "government to governed." There are two crucial distinctions between the TTPI and the conventional territorial governments.

First, the conventional territorial governments are formally part of a federal system under United States sovereignty. They function primarily as political subdivisions of the United States. See, e.g., U.S. v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). In contrast, the TTPI government exists solely for the purpose of fulfilling the United States' Trusteeship Agreement obligations. Gale v. Andrus, 643 F.2d at 830. As the Oppenheim treatise cited by the parties reflects, "the relation of trust... implies fundamentally a relation of service and delegation wholly incompatible with any exclusiveness of rights of sovereignty." L. Oppenheim, International Law, § 94n at 237.

Although the TTPI may be structurally similar to other territorial governments and similarly subject to plenary federal control, its reasons for existence - the fulfillment of an international United States trust obligation - are completely unique. Moreover, under Trusteeship Agreement Article 3, the authority which the TTPI exercises on behalf of the United States is exercised "subject to" the specific·obligations to Micronesians which the Agreement establishes. No conventional territorial government operates under a comparably qualified grant of authority. As this Court noted in Sablan Construction Co. v. Trust Territory, 526 F.Supp. 135, 141 (D.N.M.I.App.Div. 1981), the TTPI High Court itself has characterized the TTPI government as "'merely a name under which the United States carries out its obligations as Administering Authority under the Trusteeship Agreement.' Alig v. Trust Territory, 3 T.T.R. 64, 67 (H.C.Tr.Div. 1965), aff'd 3 T.T.R. 603, 612 (H.C.App.Div. 1967)".

Second, the TTPI is distinguishable from conventional territorial governments because it governs without the consent of the governed. Although other territorial governments operate pursuant to congressionally enacted organic legislation, their chief executives and local officials are popularly elected and locally controlled. The TTPI government consists of the High Commissioner and the High Court. The 9th Circuit specifically recognized in People of Saipan that "the High Commissioner's authority does not come from the people of the Trust Territory nor do they have any method of removing him when dissacisfied with his actions or policies.'" 502 F.2d at 98 n.10.

671

For the reasons stated above, this Court concludes that the Trusteeship Agreement creates an express trust at least as to land in the islands. Trusteeship Agreement Article 6.2 is unequivocally clear: the TTPI, to the same extent as the United States itself[10] is legally bound to protect the area's inhabitants against the loss of their lands. Moreover, as the 9th Circuit squarely decided in People of Saipan, this obligation is an "affirmative" duty. 502 F.2d at 96. It is factually undisputed that the TTPI neither attempted to restore Palacios' father to possession of his property, offered compensation for its taking, nor otherwise affirmatively acted to redress the admitted taking.

Therefore, as we find that the TTPI stands in a fiduciary relationship as trustee to the peoples of the Trust Territory, we hold that the TTPI is barred from asserting the statute of limitations as a defense in this case.

### 4.

The record presents an additional issue which was raised below but not briefed on appeal. The issue is whether the Court may affirm as to the TTPI on laches grounds notwithstanding the unavailability of the limitations statute. As noted above, Restatement § 219 provides that a trustee may be insulated by laches even though the limitations statute affords no protection. The TTPI has affirmatively pleaded laches. Under § 219(1), comment a, the factors which the Court would balance are:

_ _ _ _ _ _ _ _ _ _

[10] People of Saipan, 502 F.2d at 98.

672

> "(1) The length of time which has
> elapsed between the commission
> of the breach of trust and the
> bringing of suit; (2) whether the
> beneficiary knew or had reason to
> know of the breach of trust; (3)
> whether the beneficiary was under
> an incapacity; (4) whether the
> beneficiary's interest was pre-
> sently enjoyable or enjoyable only
> in the future; (5) whether the
> beneficiary had complained of the
> breach of trust; (6) the reasons
> for the delay of the beneficiary
> in suing; (7) change of position
> by the trustee, including loss of
> rights against third persons; (8)
> the death of witnesses or parties;
> (9) hardship to the beneficiary if
> relief is not given; (10) hardship
> to the trustee if relief is given."

In addition, 219(1) comment b states:

> "The length of time necessary to
> bar the beneficiary from holding
> the trustee liable for breach of
> trust depends upon the circumstances.
> In the absence of special circums-
> tances the beneficiary is barred
> if the period of the Statute of
> Limitations applicable to actions
> at law in analogous situations has
> run." (emphasis added)

The question thus becomes a "special circumstances" inquiry.

Palacios justifies the delay in filing suit on three

"special circumstance" grounds: (1) her father did not comprehend

English; (2) he had no access to legal advice until 1962[11]; and

(3) a TTPI land officer affirmatively misled him in the 1950's to

believe that he could not sue the government for compensation.

Defendants respond with Camacho v. U.S., 494 F.2d 1363 (Ct.Cl. 1974)

_____

[11]The trial court specifically accepted this second assertion
(TR 43 - the court's reference to "Mr. St. Pierre" refers to
the first private attorney to arrive on Saipan after the
lifting of security close in 1962).

In _Camacho_, plaintiff sought compensation under the 5th Amendment for the United States' post-war assumption of control over Saipan land, which plaintiff's father once owned and which the Japanese allegedly coerced the father to convey in the 1930's. The court dismissed for failure to file within the six-year Court of Claims limitation statute. It added that the father's ignorance of 5th Amendment rights due to lack of counsel would not toll the statute. _Id._ at 1370. It cited only Court of Claims precedents for this conclusion.

_Camacho_ is distinguishable from _Palacios_ in a significant respect. The Court of Claims was applying a federal limitations statute applicable only to that court. (28 U.S.C. § 2501). The court of Claims has made clear that more flexible and equitable considerations may be entertained by courts applying "local" statutes such as 6 TTC § 302. See _Capoeman v. U.S._, 440 F.2d 1002, 1005 (Ct.Cl. 1971)(discussing _Chisholm v. House_, cited _supra_).

_Palacios'_ lack of counsel argument implicates important Trusteeship Agreement considerations. Under Article 6.1, the United States must establish a territorial legal system and, in doing so, give due recognition to indigenous custom and conditions. There were no private attorneys available on Saipan until the 1962 lifting of federal security restrictions on entry into Saipan. See, _e.g._, _Jatios v. Levi_, 1 T.T.R. 578, 585 (H.C.App.Div. 1954) (Marshall Islands case in which the court recognized that "trained lawyers... are generally not available to most Micronesians

674

as a practical matter for civil actions in most parts of the Trust Territory"). See generally D. McHenry, Micronesia: Trust Betrayed. Carregie Endowment for International Peace, Washington, D.C. (1975) (describing the security closure of Saipan between 1951 and 1962).

In determining if "special circumstances" exist for laches purposes, it is also important to consider the state of federal and Trust Territory law prior to 1974: before People of Saipan, Trusteeship Agreement claims were non-justiciable. In Pauling v. McElroy, 164 F.Supp. 390, 393 (D.D.C. 1958) aff'd on other grounds 278 F ?d 252 (D.C.Cir. 1958), cert.denied 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960), the court held that the Trusteeship Agreement is unenforceable. Moreover, the same view historically has been adopted by the High Court. See Olsen, supra, 15 Columbia J. Transnat'l L. at 485. Until at least 1974, when the 9th Circuit decided People of Saipan, Micronesian plaintiffs were without any forum in which to enforce Trusteeship Agreement claims.

Nevertheless, there are countervailing equities favoring the TTPI's position. First, it is evident that neither Palacios nor her father contested the 1953 Land Title Determination which reserved the TTPI's interest in the record.[12] This could be interpreted as a lack of diligence in asserting rights to the property.[13] Second, the passage of time undoubtedly has eliminated potential

_____
[12] However, both the Determination and Land Management Regulation No. 1, which provides for Determination appeals, are written in English. Query whether these documents could reasonably impart notice of the right to appeal to non-English speaking people.

[13] Compare Santos v. TTPI. 1 T.T.R. 463, 469 (H.C.Tr.Div. 1958)

witnesses and evidence, and would make a trial very difficult to conduct. Additional equitable considerations may also be present.

For these reasons, we remand this case to the trial court for further proceedings on the issue of laches.

### B.   CNMI/MPLC

Neither the CNMI nor MPLC is a trustee under the Trusteeship Agreement.  In the absence of facts supporting estoppel, these defendants may invoke the statute of limitations. Section 7 of the NMI Constitution's Transitional Matters Schedule authorizes the future repeal of the statute, and thus implicitly endorses defendants' present right to assert the defense.  Established case law refutes Palacios' contention that statutes of limitations violate the United States Constitution.  See, e.g., Chase Securities Corp. v. Donaldson, 325 U.S. 304, 312, 65 S.Ct. 1137, 1141, 89 L.Ed. 1628 (1945); Ackerman v. Port of Seattle, 348 P.2d 664, 667 (Wash. 1960).

It is undisputed that the CNMI and MPLC hold the road property as tranferees from the TTPI.  Palacios did not allege that the CNMI and MPLC assumed possession with notice of the TTPI's alleged breach of trust.  Restatement § 288 provides for transferee liability only if the transferee takes with notice of the trustee's breach.  Therefore, the Court holds for the CNMI and MPLC.  A prior decision of this Court has implicitly applied the principle above.  See Toves v. Salas, DCA No. 80-9009 (D.N.M.I. App.Div. Jan. 21, 1981)(per curiam)(applying 6 TTC § 302 to a

676

defendant's counterclaim for reconveyance from a private party of land which the TTPI had transferred to the party).

IV.  CONCLUSION

For the reasons stated herein, the decision of the trial court granting summary judgment against Palacios is affirmed as to CNMI and MPLC and reversed as to the TTPI.  The cause is remanded to the trial court for proceedings not inconsistent with this opinion.

DATED this ___17th___ day of June, 1983.

_____
ALFRED LAURETA
United States District Judge

_____
EARL B. GILLIAM
United States District Judge

_____
HERBERT D. SOLL
Designated Judge