# Transactions Between the Federal Financing Bank and the Department of the Treasury

This opinion reviews a possible Federal Financing Bank sale of loan assets to the Civil Service Retirement and Disability Fund and other possible related transactions between the FFB and the Department of the Treasury, and concludes that the contemplated transactions would be permissible under existing law.

February 13, 1996

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

This memorandum responds to your request for advice concerning the legal issues raised by a possible Federal Financing Bank ("FFB" or "Bank") sale of loan assets to the Civil Service Retirement and Disability Fund ("CSRDF" or "Fund") and other related transactions between the FFB and the Department of the Treasury ("Treasury"). The FFB loan assets would be sold to the CSRDF in exchange for a portion of the United States debt obligations ("public debt obligations") Treasury has previously issued to the CSRDF pursuant to 5 U.S.C. § 8348 and chapter 31 of title 31, United States Code.

You have requested specific advice as to:

(1) the FFB's authority to sell to the Fund loan assets evidencing indebtedness incurred by the United States Postal Service ("USPS") and Tennessee Valley Authority ("TVA");

(2) the Treasury Secretary's ("Secretary") authority to invest Fund monies in obligations of the USPS and obligations of the TVA;

(3) the FFB's authority to accept, in exchange for the USPS and TVA indebtedness, payment in the form of public debt obligations;

(4) whether Treasury may legally enter into a transaction with the FFB whereby Treasury would secure the public debt obligations from the FFB in exchange for the cancellation by Treasury of FFB obligations of equivalent value held by Treasury;

(5) whether the FFB may sell the public debt obligations to Treasury and whether the FFB may accept as payment for the public debt obligations the cancellation by Treasury of FFB obligations of equivalent value held by Treasury;

(6) the implications of the proposed transfer of public debt obligations to Treasury with respect to 31 U.S.C. § 3101, the debt limit; and

(7) whether the USPS and TVA obligations the FFB proposes to sell to the CSRDF are subject to the debt limit.

For the reasons indicated below, we conclude that the transactions you contemplate would be permissible under existing law. We conclude that the Federal Financing Bank Act of 1973, Pub. L. No. 93–224, 87 Stat. 937 (codified as amended at 12 U.S.C. §§ 2281–2296) ("FFB Act"), empowers the FFB to sell obligations that were issued by "federal agencies," including obligations of the USPS and TVA. We also conclude that the Secretary is authorized to invest CSRDF monies in the USPS and TVA obligations the FFB intends to sell. In addition, we conclude that the FFB has the authority to receive payment for the USPS and TVA obligations in public debt obligations. Moreover, we conclude that Treasury has the authority to enter into a transaction with the FFB whereby Treasury would acquire the public debt obligations from the FFB in exchange for the cancellation by Treasury of FFB obligations of equivalent value held by Treasury. We also conclude that the FFB has the authority to accept the cancellation of the FFB obligations as payment for the public debt obligations. In addition, we conclude that the transaction between Treasury and the FFB would result in Treasury's acquiring the previously issued public debt obligations, thus freeing up debt issuance capacity under the debt limit and permitting the Secretary to issue additional public debt obligations to the public in a commensurate amount. Finally, we conclude that the USPS and TVA obligations the FFB proposes to sell to the CSRDF in exchange for the previously issued public debt obligations are not subject to the debt limit.

## I. Background

Congress established the FFB in 1973 to "assure coordination of [federal and federally assisted borrowing] programs with the overall economic and fiscal policies of the Government, to reduce the costs of Federal and federally assisted borrowings from the public, and to assure that such borrowings are financed in a manner least disruptive of private financial markets and institutions." 12 U.S.C. § 2281. In order to further these purposes, the FFB is authorized to purchase the obligations of federal agencies. *Id.* § 2285(a). [1] As part of its regular financing activities, the FFB acquired as loan assets certain obligations of the USPS and TVA. Under the proposed transactions, the FFB would sell those loan assets to

---

[1] The FFB Act also provides that "[a]ny [f]ederal agency which is authorized to issue, sell, or guarantee any obligation is authorized to issue or sell such obligations directly to the Bank." *Id.*

the CSRDF in exchange for public debt obligations of equivalent value that are currently being held by that government-managed trust fund. Treasury would then enter into a transaction with the FFB whereby Treasury would purchase the public debt obligations received by the FFB in exchange for the cancellation by Treasury of FFB obligations of equivalent value held by Treasury. This series of trans-actions would result in Treasury's acquiring the public debt obligations that had been previously held by the CSRDF and the CSRDF's holding the USPS and TVA obligations that had been previously held by the FFB.

Your office believes that such a series of transactions would create debt issuance capacity under the debt limit in an amount equal to the public debt obligations that would be transferred to Treasury from the CSRDF. In addition, your office believes it has sufficient legal authority to undertake all the transactions described above. Moreover, your office holds the view that the USPS and TVA obligations that would be used to replace the public debt obligations previously held by the CSRDF would not count against the debt limit.

## II. Legal Discussion

### A. The FFB has the authority to sell the USPS and TVA obligations it holds as loan assets.

We believe the FFB has the authority to sell the USPS and TVA obligations it currently holds as loan assets. Section 6 of the FFB Act authorizes the FFB to "make commitments to purchase and sell, and to purchase and sell on terms and conditions determined by the Bank, any obligation which is issued, sold, or guaranteed by a [f]ederal agency." 12 U.S.C. § 2285(a); *see also Consolidated Aluminum Corp. v. TVA*, 462 F. Supp. 464, 469 (M.D. Tenn. 1978) ("The Federal Financing Bank may resell in the public markets any bonds of federal agencies which it holds.").

The USPS and TVA obligations the FFB contemplates selling to the CSRDF are "obligations" as that term is defined in the FFB Act. The FFB Act defines "obligation" as "any note, bond, debenture, or other evidence of indebtedness." 12 U.S.C. § 2282(2). According to your office, the USPS obligations the FFB intends to sell are indebtedness in the form of notes issued by the USPS under 39 U.S.C. § 2005. Your office has also informed us that the TVA obligations the FFB intends to sell are indebtedness in the form of bonds issued by the TVA under 16 U.S.C. § 831n–4. Accordingly, the USPS and TVA obligations the FFB contemplates selling qualify as "obligations" within the terms of the FFB Act.

Both the USPS and the TVA satisfy the FFB Act's definition of "[f]ederal agency." The FFB Act defines the term "federal agency" as "an executive de-partment, an independent [f]ederal establishment, or a corporation or other entity established by the Congress which is owned in whole or in part by the United

States." 12 U.S.C. § 2282(1). Section 201 of title 39, United States Code, the statutory provision establishing the USPS, provides that the USPS is "an independent establishment of the executive branch of the Government of the United States." The TVA, for its part, was created by Congress as a "body corporate," 16 U.S.C. § 831, and its board of directors is "appointed by the President, by and with the advice and consent of the Senate." *Id.* § 831a. The TVA has also been described by federal courts as "an agency of the Federal Government," *Ashwander v. TVA*, 297 U.S. 288, 315 (1936), "an instrumentality of the United States," *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 134 (1939) and "a wholly owned corporate agency and instrumentality of the United States." *United States ex rel. TVA v. An Easement And Right-Of-Way*, 246 F. Supp. 263, 269 (W.D. Ky. 1965), *aff'd*, 375 F.2d 120 (6th Cir. 1967).[2] In sum, since the loan assets the FFB contemplates selling are "obligations" that were "issued" by entities that qualify as "federal agencies" under the FFB Act, the FFB has the authority to sell them.

**B. The loan assets the FFB contemplates selling to the CSRDF are suitable investments for that government-managed trust fund.**

The legality of the proposed transactions will also depend on whether the USPS and TVA obligations the FFB intends to sell are suitable investments for the CSRDF. We conclude that they are. The statutes authorizing the USPS and TVA obligations in question both provide that obligations issued thereunder "shall":

> be lawful investments and may be accepted as security for all fiduciary, trust, and public funds, the investment or deposit of which shall be under the authority or control of any officer or agency of the [United States].

39 U.S.C. § 2005(d)(3) (emphasis added); 16 U.S.C. § 831n–4(d) (emphasis added). Congress incorporated this boilerplate trust fund investment eligibility language[3] in the statute authorizing the USPS to issue the obligations the FFB intends to sell in the Postal Reorganization Act, Pub. L. No. 91–375, sec. 2, § 2005(d)(3), 84 Stat. 719, 740 (1970), several years after the initial enactment of the CSRDF's statutory investment provisions, which occurred in 1926. *See* Act

---

[2] This Office has previously opined that "[s]everal government corporations, such as the Tennessee Valley Authority . . . were intended to be '[f]ederal agencies' within the scope of [section 2282's] corporation coverage clause." *Authority of the Federal Financing Bank to Provide Loans to the Resolution Trust Corporation*, 14 Op. O.L.C. 20, 22 (1990).

[3] Congress has included this or similar language in several other statutes authorizing federal or congressionally created entities to borrow. *See, e.g.*, 12 U.S.C. § 1435 (obligations issued by the Federal Home Loan Banks); 15 U.S.C. § 713a–4 (bonds, notes, or debentures issued by the Commodity Credit Corporation); 12 U.S.C. § 1723c (obligations of the Federal National Mortgage Association); 12 U.S.C. § 2288(d) (obligations issued by the FFB).

of July 3, 1926, ch. 801, § 11, 44 Stat. 904, 910–11.[4] The language was similarly included in the statute authorizing the TVA obligations the FFB intends to sell when that statute was enacted into law in 1959. *See* Act of Aug. 6, 1959, Pub. L. No. 86–137, sec. 1, § 15d(d), 73 Stat. 280, 283. Although the CSRDF statute contains investment provisions delineating the types of obligations the Secretary is authorized to purchase on behalf of the CSRDF, these provisions essentially mirror boilerplate provisions contained in statutes governing the investments of other government-managed trust funds.[5] Moreover, although the CSRDF statute's investment provisions have been amended from time to time since they were initially enacted,[6] our review of the amendments reveals no expressed intention on the part of Congress to exempt the CSRDF from the effect of trust fund investment eligibility provisions such as those included in the relevant USPS and TVA statutes. Accordingly, we conclude that CSRDF monies may be invested in the USPS and TVA obligations the FFB intends to sell in addition to the obligations specifically delineated in 5 U.S.C. § 8348.[7]

---

[4] Section 11, which appears to have been the first provision specifically delineating the types of obligations in which CSRDF monies could be invested, provided in relevant part:

> The Secretary of the Treasury shall invest from time to time, in interest-bearing securities of the United States or Federal farm-loan bonds, such portions of the "civil-service retirement and disability fund" as in his judgment may not be immediately required for the payment of annuities, refunds, and allowances as herein provided.

44 Stat. at 910–11.

[5] The CSRDF statute states:

> The Secretary shall immediately invest in interest-bearing securities of the United States such currently available portions of the Fund as are not immediately required for payments from the Fund. The income derived from these investments constitutes a part of the Fund.

5 U.S.C. § 8348(c). The statute further provides that the Secretary may invest CSRDF monies in public debt obligations which carry interest rates determined by the Secretary based on a formula set forth in the statute. *See id.* § 8348(d). In addition, the CSRDF statute authorizes the Secretary to "purchase other interest-bearing obligations of the United States, or obligations guaranteed as to both principal and interest by the United States, on original issue or at the market price only if he determines that the purchases are in the public interest." *Id.* § 8348(e). Language authorizing such investments is commonly found in the statutes setting forth investment criteria for government-managed trust funds. *See, e.g.,* 42 U.S.C. § 401(d) (Social Security Trust Funds); 42 U.S.C. § 1104(b) (Unemployment Trust Fund); 20 U.S.C. § 2009(b) (Harry S. Truman Memorial Scholarship Trust Fund); 20 U.S.C. § 5202(b) (Eisenhower Exchange Fellowship Program Trust Fund).

[6] The most notable changes in the CSRDF statute's investment provisions occurred in 1956, when Congress first expressly authorized the Secretary to purchase on behalf of the CSRDF public debt obligations that carry interest rates determined by the Secretary based on a statutory formula, *see* Civil Service Retirement Act Amendments of 1956, ch. 804, sec. 401, § 17(d), 70 Stat. 736, 759–60, and in 1961, when Congress required the Secretary to invest Fund monies in such public debt obligations unless he determines that it is in the public interest to invest the monies in other interest-bearing obligations of the United States. *See* Act of Oct. 4, 1961, Pub. L. No. 87–350, sec. 1(a), § 17(d), 75 Stat. 770, 770. The current wording of the CSRDF statute's investment provisions is essentially the same as it was in 1961. *See* 5 U.S.C. § 8348(c)-(e).

[7] The CSRDF statute's investment provisions do not prohibit the investment of CSRDF monies in the relevant USPS and TVA obligations. General rules of statutory construction dictate that, if possible, statutes on the same subject matter should be construed in harmony with one another. *See* 2B Norman J. Singer, *Sutherland Statutory Construction* § 51.02, at 122 (5th ed. 1992); *see also Watt v. Alaska,* 451 U.S. 259, 267 (1981). If that cannot be accomplished, "[i]t is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.'" *Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 375 (1990) (quoting *Morton v. Mancari,* 417 U.S. 535, 550–51 (1974)). Due to the boilerplate nature of the CSRDF statute's investment provisions, we believe we are not here confronted with the task of reconciling a specific statute against a general one, but are, instead, confronted with the task of reconciling two general statutes. Moreover, even if we were to accept the notion that the CSRDF statute's investment provisions are more specific, principles of statutory construction require that those provisions be construed in harmony with

Our conclusion concerning the relationship between the general trust fund investment eligibility language contained in the USPS and TVA statutes and the CSRDF is consistent with established federal case law, the longstanding practice and understanding of the Treasury and Justice Departments, and a 1985 Comptroller General opinion. In *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1244–45 (N.D. Cal. 1973), a federal district court determined that trust fund investment eligibility language resembling that which is contained in the USPS and TVA statutes mentioned above made obligations issued under statutes containing that language just as eligible for investment by government-managed trust funds benefiting American Indians as investments specifically mentioned in the trust fund statutes themselves. The court expressly cited as eligible for investment by "all [g]overnment managed trust funds" obligations issued pursuant to 16 U.S.C. § 831n–4, the provision of the United States Code under which the TVA obligations the FFB intends to sell were issued. *Manchester Band*, 363 F. Supp. at 1244. The court also found that its conclusion concerning the effect of the relevant trust fund investment eligibility language was "in accord with the intent of Congress." *Id.* at 1245.

In 1966, this Office opined that obligations of the federal land banks and the banks for cooperatives are eligible investments for all government-managed trust funds, where the statutes authorizing the issuance of such obligations contained language similar to that contained in the relevant USPS and TVA statutes. *See* Memorandum for Fred B. Smith, General Counsel, Department of the Treasury, from Frank M. Wozencraft, Assistant Attorney General, Office of Legal Counsel (Oct. 7, 1966). [8] In concluding that the specific trust fund investment eligibility language at issue was sufficient to authorize investment by all government-managed trust funds, this Office stated that statutory language essentially the same as that contained in the relevant USPS and TVA statutes "presents no problems of construction and plainly permits investments of the various Government trust funds in the affected securities whether or not the statutes creating the trusts themselves do so." *Id.* at 2. [9] Similarly, in a 1934 opinion, Attorney General Homer Cummings advised that, even though the specific trust fund statute at issue did not expressly authorize it, government-managed postal savings funds could be in-

---

the trust fund investment eligibility language contained in the relevant USPS and TVA statutes. Because the CSRDF statute's investment provisions do not purport to supersede other statutes establishing that obligations issued thereunder are eligible investments for government-managed trust funds and the relevant USPS and TVA statutes demonstrate Congress's intention that obligations issued thereunder be eligible investments for all government-managed trust funds, the better interpretation is that the relevant USPS and TVA statutes have the effect of expanding the universe of authorized CSRDF investments.

[8] The pertinent trust fund investment eligibility language pertaining to obligations of the federal land banks and the banks for cooperatives provided that obligations issued by those entities " 'shall be a lawful investment for all fiduciary and trust funds, and may be accepted as security for all public deposits.' " *Id.* at 1 (quoting section 27 of the Federal Farm Loan Act, ch. 245, 39 Stat. 360, 380 (1916), and section 1 of the Act of August 23, 1954, ch. 834, 68 Stat. 770, 771).

[9] The statutes to which this Office referred provided that the obligations issued thereunder "shall be lawful investments, and may be accepted as security, for all fiduciary, trust, and public funds the investment or deposit of which shall be under the authority or control of the United States or any officer or officers thereof." *Id.* at 2 & n.3.

vested in bonds issued under the Federal Farm Mortgage Corporation Act on account of trust fund investment eligibility language contained in that act which was similar to that contained in the relevant USPS and TVA statutes. *Investment of Postal Savings Funds in Bonds of Federal Farm Mortgage Corporation*, 37 Op. Att'y Gen. 479, 480 (1934). [10]

It has been Treasury's longstanding practice to invest monies contained in government-managed trust funds, including the CSRDF, in public debt obligations or other obligations that have been authorized by Congress as legal investments for all government-managed trust funds. *See Temporary Increase in Debt Ceiling: Hearings Before the House Comm. on Ways and Means*, 90th Cong. 52 (1967) (statement of Hon. Henry H. Fowler, Secretary of the Treasury) ("1967 Hearings"). [11]

During the 1985 debt limit crisis, Secretary of the Treasury James Baker invested CSRDF monies in obligations issued by the FFB pursuant to 12 U.S.C. § 2288(a), which are not public debt obligations. That action was the subject of a congressional hearing at which a Comptroller General opinion was presented. *See Federal Financing Bank and the Debt Ceiling: Hearing Before the Subcomm. on Economic Stabilization of the House Comm. on Banking, Finance and Urban Affairs*, 99th Cong. 28–34 (1985) ("*Federal Financing Bank and the Debt Ceiling*"). In concluding that the investment and related transactions met all applicable legal requirements, the Comptroller General opinion stated that "12 U.S.C. § 2288(d) provides that the [FFB's] obligations 'shall be lawful investments, and may be accepted as security for all fiduciary, trust, and public funds, the investment of which shall be under the authority or control of the United States.'" Memorandum for the Honorable John J. LaFalce, Chairman, Subcommittee on Economic Stabilization, House Committee on Banking, Finance and Urban Affairs, from Milton J. Socolar, Comptroller General of the United States, B-138524, at 2 (Comp. Gen. 1985) ("Comp. Gen. Op."), *reprinted in Federal Financing Bank and the Debt Ceiling* at 32.

## C. The FFB is authorized to receive payment for the loan assets it intends to sell to the CSRDF in public debt obligations.

In analyzing the proposed transactions, we must also consider whether it is permissible for the FFB to receive payment in the form of public debt obligations

---

[10] The pertinent trust fund investment eligibility language provided as follows: " 'Such bonds . . . may be accepted as security, for all fiduciary, trust, and public funds the investment or deposit of which shall be under the authority or control of the United States or any officer or officers thereof.' " *Id.* (quoting Federal Farm Mortgage Corporation Act, ch. 7, § 4(a), 48 Stat. 344, 345 (1934)).

[11] In testimony before the House Ways and Means Committee, Secretary Fowler stated that, in practice, Treasury had refrained from investing monies contained in government-managed trust funds in participation certificates issued by the Export-Import Bank because, unlike the statute authorizing the issuance of Federal National Mortgage Association participation certificates, the statute authorizing the issuance of Export-Import Bank participation certificates did not contain a provision making them generally eligible for investment by government-managed trust funds. *Id.*; *see also id.* at 179–80.

for the USPS and TVA obligations it intends to sell. We conclude that the FFB is authorized to accept public debt obligations as a form of payment. As stated above, the FFB Act authorizes the FFB to sell obligations issued by federal agencies "on terms and conditions determined by the Bank." 12 U.S.C. § 2285(a). We believe this broadly worded statutory authority allows the FFB reasonably to negotiate and determine the form of compensation to be received upon such a sale. [12] Accordingly, no significant legal issues appear to be raised by the FFB's plan to receive public debt obligations in exchange for the USPS and TVA obligations it intends to sell to the CSRDF.

In his 1985 opinion, the Comptroller General apparently concluded that no significant legal issues were raised by the FFB's acceptance of public debt obligations in exchange for the sale of its own obligations to the CSRDF. *See* Comp. Gen. Op. at 2, *reprinted in Federal Financing Bank and the Debt Ceiling* at 32. In view of the fact that we have found nothing in the FFB Act prohibiting the FFB's acceptance of public debt obligations in exchange for the loan assets it intends to sell, and in light of the Comptroller General's apparent view in 1985 that such activity did not raise legal issues, we see no reason why, under current conditions, the FFB should not be able to accept public debt obligations as compensation for the USPS and TVA obligations it intends to sell.

**D. Treasury has the authority to enter into a transaction with the FFB whereby Treasury would purchase the public debt obligations received by the FFB in exchange for the cancellation by Treasury of FFB obligations of equivalent value held by Treasury.**

We must also consider whether Treasury has the authority to enter into a transaction with the FFB whereby Treasury would purchase the public debt obligations received by the FFB in exchange for the cancellation by Treasury of FFB obligations of equivalent value held by Treasury. We conclude that Treasury has the authority to enter into such a transaction.

Treasury has the authority to redeem or purchase public debt obligations prior to maturity. Section 3111 of title 31, United States Code, states in pertinent part:

> An obligation may be issued under this chapter to buy, redeem, or refund, at or before maturity, outstanding bonds, notes, certificates of indebtedness, Treasury bills, or savings certificates of the United States Government. Under regulations of the Secretary of the Treasury, money received from the sale of an obligation and

---

[12] As noted above, the FFB Act also grants the FFB the authority to purchase obligations issued by federal agencies. *See* 12 U.S.C. § 2285(a). Since the public debt obligations the FFB intends to receive in exchange for the USPS and TVA obligations were issued by Treasury, a "federal agency" under the FFB Act, it would appear that the FFB has the authority to purchase them from the CSRDF.

other money in the general fund of the Treasury may be used in making the purchases, redemptions, or refunds.

31 U.S.C. §3111.

Treasury issued the public debt obligations currently being held by the CSRDF pursuant to 5 U.S.C. §8348 and chapter 31 of title 31, United States Code. *See* 5 U.S.C. §8348(d) ("The purposes for which obligations of the United States may be issued under chapter 31 of title 31 are extended to authorize the issuance at par of public-debt obligations for purchase by the Fund."). All forms of public debt obligations covered by 31 U.S.C. §3111 are authorized to be issued under chapter 31 of title 31, United States Code. *See* 31 U.S.C. §§3102–3105. Accordingly, although the CSRDF statute imposes greater limits on the Secretary's discretion to fashion terms and conditions of public debt obligations issued to the CSRDF than the statute setting forth the procedures for issuing public debt obligations in general, *compare* 5 U.S.C. §8348(d) *with* 31 U.S.C. §3121, the public debt obligations currently being held by the CSRDF are no less subject to the terms of §3111 than public debt obligations held by the general public. Whether a public debt obligation held by the CSRDF is a "bond," "note," or "certificate of indebtedness" for purposes of §3111 depends, therefore, on the instrument's term of maturity, which was determined upon its issuance, and not on its status as an investment of a government-managed trust fund. *Cf.* 31 U.S.C. §3102(a) (specifying that bonds authorized to be issued under that section may be issued either "to the public" or "to Government accounts."). Your office has informed us that, based on this analysis, the public debt obligations the FFB plans to acquire from the CSRDF are all covered by the provisions of 31 U.S.C. §3111.

As fashioned, §3111 does not expressly authorize Treasury to finance the redemption prior to maturity of previously issued public debt obligations with all possible instruments of value under its control. However, it is reasonable to interpret §3111 as not imposing strict limitations on the manner in which Treasury may redeem public debt obligations, but rather as merely providing express authority for the use by Treasury of two methods for raising the funds needed to effect such redemptions. A contrary interpretation of §3111 would produce the illogical result of barring Treasury from using other means at its disposal that, depending on the circumstances, might be less costly to the government or more fiscally and financially prudent than the methods expressly contemplated under the statute. Accordingly, we conclude that §3111 impliedly grants Treasury the authority to use the FFB obligations to finance its purchase of the public debt obligations.

Our conclusion that Treasury has implied authority under 31 U.S.C. §3111 to use a portion of its FFB obligation holdings to purchase prior to maturity the public debt obligations at issue is bolstered by the statutory authority granted to the Secretary pursuant to 31 U.S.C. §324 and 12 U.S.C. §2288(b). Section 324 of title 31, United States Code, provides in relevant part:

> (a) The Secretary of the Treasury may —
> (1) dispose of obligations —
>
> > (A) acquired by the Secretary for the United States Govern-
> > ment . . . .
>
> (b) The Secretary may dispose or extend the maturity of obligations
> under subsection (a) of this section *in the way, in amounts, at prices
> (for cash, obligations, property, or a combination of cash, obliga-
> tions, or property), and on conditions the Secretary considers advis-
> able and in the public interest.*

31 U.S.C. § 324 (emphasis added). Treasury acquired the FFB obligations it cur-
rently holds pursuant to 12 U.S.C. § 2288(b). That statute authorizes the FFB to
"issue its obligations to the Secretary" and authorizes the Secretary to purchase
any such obligations. [13] Accordingly, the FFB obligations currently being held
by Treasury are "obligations . . . acquired by the Secretary for the United States
Government," as those terms are used in 31 U.S.C. § 324. Subsection (b) of § 324
grants the Secretary broad authority to dispose of the FFB obligations he holds.
We believe that authority includes the authority to use them as currency in acquir-
ing the public debt obligations.

In addition to general authority to dispose of "obligations . . . acquired by
the Secretary for the United States Government" under § 324, the Secretary has
specific authority to dispose of the FFB obligations he holds. Section 2288(b)
of title 12, United States Code, provides that "[t]he Secretary . . . may sell, *upon
such terms and conditions and at such price or prices as he shall determine,*
any of the obligations acquired by him under this subsection." 12 U.S.C.
§ 2288(b) (emphasis added). This broadly worded authority also provides support
for the conclusion that the Secretary may dispose of the FFB obligations he holds
in a manner that allows him to acquire the public debt obligations, as it appears
to allow the Secretary reasonably to determine the terms and conditions of such
a disposal.

We believe our conclusion that Treasury has the authority to use the FFB obliga-
tions it currently holds to purchase the public debt obligations it has previously
issued to the CSRDF is again consistent with the 1985 Comptroller General opin-
ion. In that opinion, the Comptroller General did not question Treasury's authority,

---

[13] In order to enable the FFB to support its financing activities, the FFB Act provides that, in addition to issuing
up to $15 billion worth of its debt obligations to the public, "the [FFB] is . . . authorized to issue its obligations
to the Secretary of the Treasury." 12 U.S.C. § 2288(b), *see also* H.R. Rep. No. 92–1478, at 5 (1972) ("The Bank's
activities would be financed, in general, by . . . Bank obligations issued to the Secretary of the Treasury."). The
same provision of the FFB Act that authorizes the FFB to issue its obligations to Treasury also authorizes Treasury
to purchase and agree to purchase such obligations. 12 U.S.C. § 2288(b). No express limitation is placed on the
amount of its own obligations that the FFB may issue to Treasury. Treasury currently holds approximately $67
billion worth of these obligations.

exercised in a similar manner, to purchase from the FFB prior to maturity the public debt obligations it had previously issued to the CSRDF. *See* Comp. Gen. Op. at 2, *reprinted in Federal Financing Bank and the Debt Ceiling* at 32.

Based on the authorities granted to the Secretary under 31 U.S.C. §§ 3111 and 324, and 12 U.S.C. § 2288(b), and the conclusions of the 1985 Comptroller General opinion, we conclude that Treasury would have the authority to purchase from the FFB prior to maturity the public debt obligations it has previously issued to the CSRDF pursuant to the transaction described above.

## E. The FFB has the authority to sell the public debt obligations to Treasury and to accept the cancellation by Treasury of FFB obligations of equivalent value as payment for the public debt obligations.

Treasury's ability to complete the proposed transactions will also depend on whether the FFB has the authority to sell the public debt obligations and accept the cancellation by Treasury of FFB obligations of equivalent value as payment for the public debt obligations. We conclude that the FFB has such authority. As stated above, section 6 of the FFB Act grants the FFB the authority to sell obligations issued by federal agencies. 12 U.S.C. § 2285(a). The public debt obligations the FFB intends to sell to Treasury are "obligations" within the terms of the FFB Act, as they are represented in the form of notes, bonds, debentures, or other evidence of indebtedness. *Id.* § 2282(2). The public debt obligations also were issued by the Department of the Treasury, a "federal agency" as that term is defined in the FFB Act. *See id.* § 2282(1). In sum, the FFB Act grants the FFB the authority to sell the public debt obligations to Treasury. Moreover, as stated above, the FFB Act authorizes the FFB to sell obligations issued by federal agencies "on terms and conditions determined by the Bank." *Id.* § 2285(a). This broadly worded statutory authority allows the FFB reasonably to negotiate and determine the form of compensation to be received upon such a sale. Accordingly, the FFB may, consistent with this authority, require and accept the cancellation of a portion of its own indebtedness held by Treasury as payment for the public debt obligations. [14]

---

[14] The purchase authority provided to the FFB under section 6 of the FFB Act also authorizes the FFB to accept the cancellation of a portion of its own obligations held by Treasury as payment for the public debt obligations. By accepting the cancellation of the FFB obligations as payment for the public debt obligations, the FFB would be effectively purchasing such obligations. Because the FFB obligations are "obligations" that were issued by the FFB, a "federal agency" under the FFB Act, *see* 12 U.S.C. §§ 2282(1), 2283, the FFB has the authority to purchase them in the manner discussed above.

**F. Transfer of the relevant public debt obligations to Treasury would reduce the amount of outstanding debt subject to limit by the amount of public debt obligations transferred.**

In our analysis, we must also consider the effect on the debt limit of the proposed transfer of public debt obligations from the CSRDF to Treasury. We conclude that the transfer of these obligations to Treasury would effectively cancel them, reducing the amount of outstanding debt subject to limit and thus creating room under the debt limit for additional public borrowing. The relevant provision of the debt limit statute, 31 U.S.C. § 3101(b), provides:

> The face amount of obligations issued under this chapter and the face amount of obligations whose principal and interest are guaranteed by the United States Government (except guaranteed obligations held by the Secretary of the Treasury) may not be more than $4,900,000,000,000, outstanding at one time, subject to changes periodically made in that amount as provided by law through the congressional budget process described in Rule XLIX of the Rules of the House of Representatives or otherwise.

Quite simply, if transferred to Treasury, the public debt obligations in question would no longer be "outstanding" within the terms of the debt limit statute. Accordingly, the amount of outstanding debt subject to limit would be reduced by the amount of such public debt obligations. *See The Secretary of the Treasury's Authority With Respect to the Civil Service Retirement and Disability Fund*, 19 Op. O.L.C. 286, 291 n.9 (1995); *see also* Comp. Gen. Op. at 2, *reprinted in Federal Financing Bank and the Debt Ceiling* at 32 (Comptroller General opining that "when the [FFB] prepaid $5 billion of its debt with Treasury's own obligations, Treasury's outstanding debt was reduced by $5 billion. Therefore, Treasury was able to borrow an additional $5 billion from the public."). The borrowing capacity freed up by the transaction could be used to support additional Treasury borrowing up to the debt limit, if, as we indicate below, the loan assets the FFB intends to sell to the CSRDF as a replacement for the public debt obligations at issue are not themselves subject to the debt limit.

**G. The USPS and TVA obligations the FFB intends to sell to the CSRDF in exchange for the transferred public debt obligations are not themselves subject to the debt limit.**

In order to ensure that the series of transactions contemplated by Treasury would allow it legally to issue additional public debt obligations to the public in an amount less than or equal to the amount of public debt obligations secured from

75

the CSRDF through the FFB's sale of the loan assets, we must consider whether the USPS and TVA obligations that would replace the transferred public debt obligations as CSRDF investments are not themselves subject to the debt limit. Based on the express terms and the legislative history of the relevant USPS and TVA borrowing statutes, we conclude that they are not.

As its express terms suggest, the debt limit applies to debt issued directly by Treasury pursuant to chapter 31 of title 31 of the United States Code. It also applies to direct borrowing by certain other federal agencies and corporations which is guaranteed as to principal and interest by the United States. *See* H.R. Rep. No. 79–246, at 2–3 (1945); S. Rep. No. 79–106, at 2 (1945). [15] As indicated by his 1985 opinion, the Comptroller General holds the view that the phrase "obligations whose principal and interest is guaranteed by the United States Government" applies to the direct obligations of federal issuers other than Treasury if the statutes authorizing such issuers to borrow expressly provide for such guarantee or Congress has indicated its desire to provide the guarantee in the relevant legislative history. *See* Comp. Gen. Op. at 2–3, *reprinted in Federal Financing Bank and the Debt Ceiling at 32–33.*

The USPS and TVA obligations the FFB intends to sell are not subject to the debt limit. Obligations of the USPS and TVA are not issued by Treasury pursuant to chapter 31 of title 31 of the United States Code. Therefore, in order for the obligations the FFB intends to sell to be subject to the debt limit, they must be "obligations whose principal and interest are guaranteed by the United States Government." The statute authorizing the issuance of USPS obligations provides that such obligations shall "not be obligations of, nor shall payment of the principal thereof or interest thereon be guaranteed by, the Government of the United States, except as provided in section 2006(c) of this title." 39 U.S.C. § 2005(d)(5). Section 2006(c) provides, in turn, that obligations issued by the USPS shall be guaranteed as to principal and interest by the United States,

> *if and to the extent that—*
>
> (1) the [USPS] requests the Secretary . . . to pledge the full faith and credit of the Government of the United States for the payment of principal and interest thereon; and

---

[15] *See also Second Liberty Bond Act, as Amended—Participation Certificates Issued by Federal National Mortgage Association,* 42 Op. Att'y Gen. 341, 342 (1967) ("[B]y the act of April 3, 1945, c. 51, 59 Stat. 47, Congress brought the borrowings of certain agencies other than the Treasury within the overall debt limitation. . . . The [relevant] Committee reports . . . reveal that [the 1945 debt limit] amendment was adopted to embrace the borrowings of each of eight agencies, named in the reports, whose governing statutes provided that their obligations were fully and unconditionally guaranteed as to principal and interest by the United States. . . . From this brief history, it is clear that [the debt limit] is concerned with debt that arises from borrowing, and with nothing else."); 1967 Hearings at 40 (Secretary of the Treasury Henry H. Fowler testifying that "the history of [the 1945 act amending the statutory debt limit], which first brought so-called guaranteed obligations within the statutory debt limit, confirmed that Congress had in mind only certain obligations of certain agencies. The committee report named each Government agency then being affected. And there were cited the respective statutes authorizing the issuance of the so-called obligations.").

> (2) the Secretary, in his discretion, determines that it would be in the public interest to do so.

*Id.* § 2006(c) (emphasis added).

The legislative history of the statutory provisions discussed above provides:

> Obligations sold to the public would not be guaranteed by the United States and would not be within the debt ceiling unless the Postal Service requests the Secretary of the Treasury to pledge the full faith and credit of the United States and the Secretary determines that it would be in the public interest to do so.

H.R. Rep. No. 91–1104, at 10 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3659. Your office has informed us that the USPS obligations the FFB contemplates selling were not issued under the special conditions set forth in § 2006(c), but were, instead, issued pursuant to § 2005. Based on this representation, we conclude that such obligations are not subject to the debt limit.

Similarly, the statutory provision authorizing the issuance of the TVA obligations the FFB intends to sell to the CSRDF, 16 U.S.C. § 831n–4, [16] provides that obligations issued thereunder "shall not be obligations of, nor shall payment of the principal thereof or interest thereon be guaranteed by, the United States." 16 U.S.C. § 831n–4(b). Accordingly, the TVA obligations the FFB intends to sell to the CSRDF are also not subject to the debt limit.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[16] Section 831n–4(a) of title 16 currently authorizes the TVA to issue up to $30 billion in debt obligations "to assist in financing its power program and to refund such [indebtedness]."